## REGIONAL ECONOMIC COMMUNITY ACTION PROGRAM, INC., Plaintiff–Appellant,

and

## United States of America, Intervenor–Plaintiff–Appellant,

v.

## CITY OF MIDDLETOWN, City of Middletown Planning Board, and Joseph DeStefano, Defendants–Appellees.

### Docket Nos. 00–6318, 00–6354.

United States Court of Appeals, Second Circuit.

Argued June 7, 2001.

Decided Feb. 5, 2002.

Leslie A. Lupert, Orans, Elsen & Lupert, LLP (Simeon Goldman, Disability Advocates, Inc., of counsel), New York, NY, for Plaintiff–Appellant.

Jeffrey Oestericher, Assistant United States Attorney for the Southern District of New York (Mary Jo White, United States Attorney, and Neil M. Corwin and Sara L. Shudofsky, Assistant United States Attorneys, of counsel), for Intervenor–Plaintiff–Appellant.

Alex Smith (Robert N. Isseks, of counsel), Middletown, NY, for Defendants–Appellees.

Before: KEARSE, STRAUB and SACK, Circuit Judges.

SACK, Circuit Judge.

The plaintiff, Regional Economic Community Action Program, Inc. ("RECAP"), and the intervenor-plaintiff, the United States of America, brought this action under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* ("FHA"), the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), and the Rehabilitation Act, 29 U.S.C. § 701 *et seq.* They alleged that the defendants—the City of Middletown ("Middletown" or "the City"), located in Orange County, New York, the City of Middletown Planning Board ("Planning Board"), and Joseph DeStefano, the mayor of Middletown—discriminated against RECAP on the basis of its clients' disabilities by refusing to grant RECAP a special-use permit authorizing it to establish two halfway houses for recovering alcoholics. The United States District Court for the Southern District of New York (Charles L. Brieant, *Judge*) granted summary judgment to the defendants on all of the plaintiffs' claims. Because we find sufficient evidence from which a reasonable juror could infer disparate treatment by the City and the Planning Board and retaliation by the City and DeStefano, we vacate the district court's grant of summary judgment as to those claims. But we affirm the court's grant of summary judgment on the disparate impact claim against all three defendants and the discrimination claims against DeStefano.

## BACKGROUND

### I. The RECAP Project

Because the plaintiffs appeal from the grant of a summary judgment against them, we recite the relevant facts in the light most favorable to them. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir.2001).

RECAP, a not-for-profit corporation founded in 1965, provides education, housing, social services, and other forms of assistance to low income individuals in Orange County, New York. In 1994, RECAP sought to create a "family support community" in the City by consolidating the operation of several proposed and existing assistance programs on two parcels of land near its existing outpatient clinic for recovering alcoholics. RECAP's plan involved three properties: (1) its existing facility located at 40 Smith Street; (2) a parcel of land directly across the street owned by Gary Formisano (the "Formisano property"); and (3) the lot adjacent and to the north of the Formisano property, owned by Richard Rowley (the "Rowley property").

A railroad track once owned by the Ontario & Western Railroad ("O & W") runs along the eastern borders of both the Rowley and Formisano properties. A rail spur on the Rowley property connects it to the O & W track. RECAP intended to use the Rowley property for "Head Start" classes, daycare for infants, and pediatric medical and dental services. It planned to convert an existing building on the Formisano property into a halfway house for twenty-four men recovering from alcoholism. Finally, RECAP's plan contemplated the construction of a new building located partly on the Rowley property and partly on the Formisano property to house twenty recovering alcoholic mothers and their children. Full-time staff would supervise both halfway houses twenty-four hours a day.

In 1994, Middletown's zoning ordinances applicable to these properties authorized "cumulative zoning," which allows both residential and commercial uses in an industrial zone. The Rowley property was zoned "I–2," or heavy industrial; the Formisano property was zoned "I–1," or light

industrial. Both the childcare facility proposed for the Rowley property and the halfway houses proposed for the Formisano and Rowley properties were permitted uses under these zoning ordinances, but each required a special-use permit from the Planning Board. All zones, both residential and industrial, require special-use permits for the construction of multi-family housing units. The purpose of a special-use permit is to allow the Planning Board to determine whether a proposed project will have an unduly adverse effect on the neighborhood. *See Pacer, Inc. v. Planning Bd.*, 217 A.D.2d 47, 50–51, 635 N.Y.S.2d 704, 705–06 (3d Dep't 1995).

Although both properties were part of a single project, RECAP had to apply to the Planning Board separately for a special-use permit for each property. The Planning Board considered RECAP's application regarding the Rowley property, where RECAP planned to establish the childcare center, during two hearings held in August and September 1994. It unanimously approved the special-use permit for that property at the September hearing, subject to negotiation of a specific agreement for the payment of taxes and confirmation that the project would not adversely affect the environment.

The Planning Board first considered RECAP's application for a special-use permit for the Formisano property—the parcel where RECAP intended to establish one halfway house for recovering alcoholics, and part of the home for recovering alcoholic mothers and their children—at the August 1994 hearing. This and subsequent hearings about the Formisano property became, unlike the discussions about the Rowley property, contentious. The Planning Board debated RECAP's application at four hearings held between August 1994 and December 1994. At the final meeting in December, the members of the Planning Board denied RECAP's application by a vote of four to two.

Shortly thereafter, RECAP requested that the Planning Board reconvene to consider providing a reasonable accommodation for RECAP's clients' disabilities and to reconsider its decision to deny RECAP a special-use permit for the halfway houses that it proposed to establish on the Formisano property. The City did not respond to that request until June 1995. By then, RECAP, having lost a prospective grant, could no longer finance the project. Further details with respect to the Planning Board's deliberations on whether to issue the special-use permit for the Formisano property are set forth below in the "Discussion" section of this opinion.

II. Events Leading to RECAP's Retaliation Claim

In the early 1990s, RECAP acquired a building at 208 North Street, also in Middletown, where it planned to create a facility for the homeless. By letter dated June 23, 1993, the City's Office of Community and Economic Development informed RECAP that it would be "pleased to provide [a] commitment of $53,139 for the purchase of furnishings for the [North Street] project...." Antonio Figueroa, now RECAP's Director of Special Projects/Facilities, subsequently spoke several times with Neil Novesky, Director of the Office of Economic and Community Development, updating him on the progress of the project. Novesky told Figueroa that once RECAP notified him that the construction was complete, RECAP could draw down the committed funds.

On December 5, 1994, four days after the Planning Board denied RECAP the Formisano permit, counsel for RECAP wrote to defendant DeStefano alleging that the permit denial violated the FHA and the ADA. He threatened legal action un-

less the Board rescinded its decision. Three days later, on December 8, RECAP completed construction of the North Street project and requested release of the promised funds. The City responded in a letter the same day by requesting that RECAP submit certain forms required for withdrawal of the funds, and telling RECAP that it would forward these forms.

RECAP never received them. Instead, Figueroa called the assistant as recommended in the letter. She referred him back to Novesky, who in turn told Figueroa that he would have to speak to Alex Smith, assistant corporation counsel to the City. Smith then informed Figueroa that the funds the City had promised to RECAP would be in the form of a loan rather than a grant.

On December 20, 1994, Smith telephoned Figueroa to tell him that Mayor DeStefano was worried about RECAP's ability to secure this loan. Smith said, according to Figueroa's affidavit, that "if RECAP had not pursued legal action against the Mayor, he would be much more cooperative" and that "RECAP has to learn not to bite the hand that feeds it." On December 31, RECAP filed a complaint regarding the denial of the Formisano permit with United States Department of Housing and Urban Development ("HUD"). In April 1995, RECAP received a letter from DeStefano raising financial and labor concerns about the North Street project. RECAP responded on April 13 with a letter seeking to allay DeStefano's concerns, but received no reply. RECAP heard nothing further until early 1996, when DeStefano informed RECAP that the City had withdrawn its funding commitment.

### III. Proceedings in the District Court

In November 1997, RECAP brought this action alleging that the defendants unlawfully denied RECAP a special-use permit for the Formisano property. RECAP alleged that the defendants acted with a "discriminatory motive to prevent persons with disabilities from obtaining suitable housing in Middletown," Compl. ¶ 68, and intentionally failed "to make reasonable accommodations in Middletown's and the Planning Board's rules, policies, practices and services when such accommodations are necessary to afford people with disabilities equal opportunity to use and enjoy dwellings," Compl. ¶ 72, in violation of the FHA, the ADA, and the Rehabilitation Act. RECAP further argued that because Middletown's zoning ordinances had a disparate and adverse impact on disabled individuals, they violate the FHA. Finally, RECAP asserted a separate retaliation claim against DeStefano and the City based on their alleged refusal to honor funding commitments to RECAP with respect to the North Street project.

In June 1998, the district court permitted the United States to intervene in these proceedings. The United States named the City as the sole defendant and alleged that it had discriminated against RECAP in violation of the FHA, the ADA, and the Rehabilitation Act when the Planning Board denied RECAP a special-use permit for the Formisano property.

In February 2000, the defendants moved for summary judgment on all claims. First, they argued that the recovering alcoholics whom RECAP intended to shelter in the halfway houses were not disabled within the meaning of the FHA, the ADA, or the Rehabilitation Act. Second, they contended that, in any event, their decision to deny RECAP the special-use permit was based on legitimate, non-discriminatory reasons. Finally, they argued that summary judgment should be granted on the plaintiffs' disparate impact and reason-

able accommodation theories of liability and on RECAP's retaliation claim.

 On September 25, 2000, the district court granted the defendants' motion for summary judgment on all of the plaintiffs' claims. The district court concluded, *inter alia*, that with regard to the plaintiffs' disparate treatment claim, the defendants had articulated legitimate, non-discriminatory reasons for their action, and the plaintiffs had failed to show that those reasons were a pretext for unlawful discrimination. The district court also granted summary judgment on RECAP's disparate impact, reasonable accommodation, and retaliation claims. This appeal followed.[1]

### DISCUSSION

#### I. Standard of Review

 We review the district court's grant of summary judgment *de novo*, construing the evidence in the light most favorable to the non-moving party. *See Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir.1999), *cert. denied*, 529 U.S. 1098, 120 S.Ct. 1832, 146 L.Ed.2d 776 (2000). Summary judgment is required where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law," Fed.R.Civ.P. 56(c), i.e., "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A fact is "material" for these purposes if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

#### II. The Statutory Framework

 The plaintiffs assert claims under three federal statutes: the FHA, the ADA, and the Rehabilitation Act. The FHA makes it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap." 42 U.S.C. § 3604(f)(1). It defines discrimination to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a handicapped] person equal opportunity to use and enjoy a dwelling." *Id.* § 3604(f)(3)(B). The ADA and the Rehabilitation Act also prohibit all discrimination based on disability by public entities. Each statute requires that covered entities make reasonable accommodations in order to provide qualified individuals with an equal opportunity to receive benefits from or to participate in programs run by such entities. Specifically, the ADA provides

---

1. The district court granted DeStefano summary judgment on the discrimination claims on the independent ground that he was not a decision maker in the process through which the Planning Board denied RECAP the special-use permit and therefore could not be held personally liable. The plaintiffs do not dispute the merits of this decision on appeal and thus waive any appeal of that decision. *See* Fed. R.App. P. 28(a)(5); *LoSacco v. City of Middletown*, 71 F.3d 88, 92–93 (2d Cir. 1995). For this reason, we do not address the grant of summary judgment to DeStefano

on the plaintiff's discrimination claims. The district court's judgment in that regard remains undisturbed. The court's dismissal of the discrimination claims against DeStefano, however, does not require dismissal of the retaliation claim. *Cf. McMenemy v. City of Rochester*, 241 F.3d 279, 283 (2d Cir.2001) (noting that Title VII prohibits retaliation against an employee who opposes *"any* practice made an unlawful employment practice," not just those of the defendant) (quoting 42 U.S.C. § 2000e–3(a) (emphasis added)).

that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity," 42 U.S.C. § 12132; and the Rehabilitation Act states that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. § 794(a). "All three statutes apply to municipal zoning decisions." *Forest City Daly Hous., Inc. v. Town of North Hempstead,* 175 F.3d 144, 151 (2d Cir. 1999); *see also Innovative Health Sys., Inc. v. City of White Plains,* 117 F.3d 37, 44 (2d Cir.1997) (ADA and the Rehabilitation Act apply to zoning decisions), *overruled on other grounds by Zervos v. Verizon New York,* 252 F.3d 163, 171 n. 7 (2d Cir.2001).

III. Whether RECAP's Clients are Disabled Within the Meaning of the ADA, the FHA, and the Rehabilitation Act

■ The defendants first argue that RECAP's clients are not "disabled" within the meaning of the FHA, the ADA, and the Rehabilitation Act.[2] Notwithstanding this contention, the district court assumed that the prospective residents of the half-

way houses meet the statutory definition of "individual with a disability." We agree that they do.

To demonstrate a disability under each of these statutes, a plaintiff must show: (1) a physical or mental impairment which substantially limits one or more major life activities; (2) a record of having such an impairment; or (3) that they are regarded as having such an impairment. *See* 42 U.S.C. § 3602(h); 42 U.S.C. § 12102(2); 29 U.S.C. § 705(20). RECAP's clients fall into the first two categories.

■ In the first category, an individual is considered disabled if he or she: (1) suffers from a physical or mental impairment, that (2) affects a major life activity, and (3) the effect is "substantial." *See Bragdon v. Abbott,* 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998).

■ RECAP's clients suffer from alcoholism. Alcoholism, like drug addiction, is an "impairment" under the definitions of a disability set forth in the FHA, the ADA, and the Rehabilitation Act. *See Buckley v. Consol. Edison Co.,* 155 F.3d 150, 154 (2d Cir.1998) (in banc) (recovering drug addict may be considered to have a "disability" under the ADA); *Teahan v. Metro–North Commuter R.R. Co.,* 951 F.2d 511, 518 (2d Cir.1991) (discrimination against substance abusers illegal under the Rehabilitation Act); *Rodgers v. Lehman,* 869 F.2d 253, 258 (4th Cir.1989) (holding that "[a]lcoholism is a handicapping condition within the

**2.** The defendants do not challenge RECAP's standing to bring suit. Mindful of the necessity of standing to our jurisdiction, *see Leibovitz v. N.Y. City Transit Auth.,* 252 F.3d 179, 184 (2d Cir.2001), however, we observe that RECAP has standing both as an individual plaintiff and under organizational standing theory. *See Irish Lesbian & Gay Org. v. Giuliani,* 143 F.3d 638, 649 (2d Cir.1998). RECAP suffered an injury through the denial of its special-use permit application; it therefore has individual standing. *See Havens Realty*

*Corp. v. Coleman,* 455 U.S. 363, 379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982); *Ragin v. Harry Macklowe Real Estate Co.,* 6 F.3d 898, 905 (2d Cir.1993). Second, RECAP serves a class of individuals with discrimination claims; the interests at issue are germane to RECAP's purpose; and no individual participation is required under these circumstances. It therefore also meets the organizational standing requirements of *Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333, 347, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

meaning of the [Rehabilitation] Act"); *Sullivan v. City of Pittsburgh*, 811 F.2d 171, 182 (3d Cir.1987) ("Case law establishes that alcoholics are handicapped within the meaning of [the Rehabilitation Act]."). Legislative history also supports this conclusion. *See* H.R.Rep. No. 101–485(II), at 51 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 333 (noting that "physical or mental impairment" includes "drug addiction and alcoholism") (internal punctuation omitted). RECAP's clients therefore meet the first part of the definition of a disability.

■ But mere status as an alcoholic or substance abuser does not necessarily imply a "limitation" under the second part of that definition. *See Burch v. Coca–Cola Co.*, 119 F.3d 305, 316–17 (5th Cir.1997) (holding that alcoholism is not a per se disability under the ADA and evidence that alcoholics, in general, are impaired is inadequate to show the substantial limitation of one or more major life activities), *cert. denied,* 522 U.S. 1084, 118 S.Ct. 871, 139 L.Ed.2d 768 (1998). To prevail, a recovering drug addict or alcoholic "must demonstrate [not only] that he [or she] was actually addicted to drugs or alcohol in the past, [but also] that this addiction substantially limit[s] one or more of his [or her] major life activities." *Buckley*, 127 F.3d at 274.

As the Supreme Court recently observed: "[T]o be substantially limited . . ., an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of *central importance to most people's daily lives.*" *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, ——, 122 S.Ct. 681, 691, 151 L.Ed.2d 615, —— (2002). The impairment's impact must also be "permanent or long-term." *Id.* Major life activities include "functions such as caring for one's self, performing manual tasks,

walking, seeing, hearing, speaking, breathing, learning, and working." 28 C.F.R. § 41.31(b)(2); 45 C.F.R. § 84.3(j)(2)(ii); 24 C.F.R. § 100.201(b). The function of "caring for one's self," we have held, "encompasses normal activities of daily living; including feeding oneself, driving, grooming, and cleaning home." *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 871 (2d Cir. 1998) (citing *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 (5th Cir.1995)). *Williams* confirms that such "tasks central to most people's daily lives" constitute major life activities. 534 U.S. at ——, 122 S.Ct. at 693.

RECAP's clients qualify to live in a halfway house because they need its supportive environment. New York State regulations prescribe admission criteria that would have applied to the proposed Formisano-property halfway houses. *See* N.Y. Comp.Codes R. & Regs. tit. 14, § 375.8(c). Only "persons who are unable to maintain abstinence and continued recovery in an available independent living situation" would have had had access to the facilities. *Id.* § 375.1. In particular, RECAP could only have admitted persons who, *inter alia,* (1) had been "diagnosed as suffering from alcohol dependence"; (2) had "completed a course of alcoholism treatment" in an inpatient or outpatient setting; (3) were "determined to be unable to abstain without continued care in a structured supportive setting"; and (4) were "in need of alcoholism services on an outpatient basis in addition to the supportive counseling available in the halfway house." *Id.* § 375.8(c). Residents cannot remain once they have "attained the skills and ability necessary to maintain abstinence and continue recovery in . . . suitable independent living." *Id.* § 375.1(g).

We therefore conclude, as did the United States District Court for the District of New Jersey on a similar issue, that RE-

CAP's clients' "addictions substantially limit their ability to live independently and to live with their families"; that they are "entitled thereby to the protections of [the FHA, ADA, and the Rehabilitation Act]"; and that their "inability to live independently constitutes a substantial limitation on their ability to 'care for themselves.'" *United States v. Borough of Audubon,* 797 F.Supp. 353, 359 (D.N.J.1991), *aff'd,* 968 F.2d 14 (3d Cir.1992). Because the inability to live independently without suffering a relapse—a baseline prerequisite for admittance to the RECAP facility—limits the major life activity of "caring for one's self," an activity that is "necessarily [an] important part[ ] of most people's lives," *Williams,* 534 U.S. at ——, 122 S.Ct. at 693, the residents of the proposed halfway houses would have met the second part of the statutory definition of a disability. All of the halfway house's residents must be substantially impaired in a major life activity to continue residing there.[3]

 Finally, to qualify as disabled, the limitation of RECAP's clients must have been "substantial." A limitation is substantial if it "[s]ignificantly restrict[s] ... the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1). Individuals must show only "substantial limitations," not "utter inabilities," to qualify for statutory protection. *Bragdon,* 524 U.S. at 641, 118 S.Ct. 2196. Here, the plaintiffs' clients would have been deemed substantially limited because they are unable to abstain from alcohol abuse without

continued care; absent assistance, they cannot adequately care for themselves. *See Borough of Audubon,* 797 F.Supp. at 359 (finding a substantial limitation under analogous circumstances). Their impairment is also long-term. *See Williams,* 534 U.S. at ——, 122 S.Ct. at 691. Under New York law, a halfway house admits only those to be discharged "between three and nine months after admission." N.Y. Comp.Codes R. & Regs. tit. 14, § 375.8(g); *see also id.* § 375.8(f)(3) (providing for monthly assessments).

In any event, even if RECAP's clients did not meet the first definition of a disability, they would qualify under the second because they have a record of having an impairment. *See* 42 U.S.C. § 12102(2)(B).

## IV. Analysis of the Plaintiffs' Claims

 Plaintiffs who allege violations under the ADA, the FHA, and the Rehabilitation Act may proceed under any or all of three theories: disparate treatment, disparate impact, and failure to make reasonable accommodation. *See Doe v. Pfrommer,* 148 F.3d 73, 82 (2d Cir.1998) (noting the possible application of these three theories under the ADA and the Rehabilitation Act); *see also Forest City Daly Hous., Inc.,* 175 F.3d at 150–51 (all three statutes permit reasonable accommodation claims); *Smith & Lee Assocs., Inc. v. City of Taylor,* 102 F.3d 781, 790 (6th Cir.1996) (FHA permits all three theories). The plaintiffs in this case make claims under each.

## A. Disparate Treatment Theory

 The plaintiffs allege that the Planning Board denied RECAP's application for a special use permit for the Formisano

---

**3.** While the determination of substantial impairment is admittedly made "in ... a case-by-case manner," the existence of statutorily defined levels of impairment obviates the concern expressed in *Williams* about varying intensities of symptoms. *Id.* 534 U.S. at ——, 122 S.Ct. at 692.

property because of the identity of the residents of the proposed halfway houses—recovering alcoholics. The district court concluded, however, that the plaintiffs had failed to raise a triable issue of fact as to whether the Planning Board's stated reason for the denial was a pretext for discrimination. We disagree.

We analyze claims of intentional discrimination under the FHA, the ADA, and the Rehabilitation Act under the familiar *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), burden-shifting analysis established for employment discrimination cases under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq. See Smith & Lee Assocs., Inc.,* 102 F.3d at 790–91; *Cabrera v. Jakabovitz,* 24 F.3d 372, 380–84 (2d Cir.1994). Under this scheme, the plaintiffs must first establish a prima facie case of discrimination. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817.

To establish a prima facie case of discrimination under the FHA and the ADA, the plaintiffs must present evidence that "animus against the protected group was *a* significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive." *LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 425 (2d Cir.1995) (emphasis added; citation and internal quotation marks omitted); *see also Smith & Lee Assocs.,* 102 F.3d at 790 (noting that to establish a prima facie case, the plaintiff must show "that discriminatory purpose was a motivating factor in the City's decision to deny ... [the] petition") (citation and internal quotation marks omitted). To establish a prima facie case of discrimination under the Rehabilitation Act, by contrast, the plaintiffs must show that the defendants denied the permit "solely" because of the disability. *See Flight v. Gloeckler,* 68 F.3d 61, 64 (2d Cir.1995).

If the plaintiffs make out a prima facie case, then the burden of production shifts to the defendants to provide a legitimate, nondiscriminatory reason for their decision. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.,* 198 F.3d 68, 72 (2d Cir.1999). If the defendants meet that burden, "the *McDonnell Douglas* framework ... disappear[s] and the sole remaining issue [is] discrimination *vel non.*" *Reeves,* 530 U.S. at 142–43, 120 S.Ct. 2097 (citations and internal quotation marks omitted). The plaintiffs must then prove that the defendants intentionally discriminated against them on a prohibited ground. *See id.* at 143, 120 S.Ct. 2097. Where, however, the plaintiffs "make a substantial showing" that the defendants' proffered explanation was false, "it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Id.* at 146–47, 120 S.Ct. 2097 (emphasis in original).

The district court in this case concluded that the plaintiffs had failed to demonstrate the presence of a triable issue of fact as to whether the defendants' "articulated, legitimate, non-discriminatory" reasons were pretextual. *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown,* No. 97 Civ. 8808(CLB), slip op. at 13 (S.D.N.Y. Sept. 25, 2000). We disagree. Based on the evidence in the record, we think that a reasonable juror could conclude that the defendants' proffered reason for denying RECAP a special-use permit was a pretext for unlawful discrimination.

"Discriminatory intent may be inferred from the totality of the circum-

stances, including ... the historical background of the decision ...; the specific sequence of events leading up to the challenged decision ...; [and] contemporary statements by members of the decision-making body...." *LeBlanc,* 67 F.3d at 425 (citations and internal quotation marks omitted). The district court correctly decided that the plaintiffs introduced sufficient evidence from which a reasonable juror could conclude that the plaintiffs made out a prima facie case. Their initial burden of production under the *McDonnell Douglas* analysis is "minimal." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *McGuinness v. Lincoln Hall,* 263 F.3d 49, 53 (2d Cir.2001). City officials and Planning Board members made numerous statements from which a reasonable juror could infer that they denied RECAP's permit application because of the identity of its clients. For example, Mayor DeStefano began the August 1994 hearing about the Formisano permit by stating:

> And what I have tried to convey to RECAP and through different surrogate[s] is that enough is enough. And that in order for RECAP to maintain the level of respect in the community, to maintain the level of cooperation from not only governmental agencies, but this people [sic] that live in and around these areas, that they have to recognize that Middletown is not the hub of human services programs.... But at some point we have tried to say to the different not for profit agencies that in regards to housing enough is enough. That the city is over and above has done more than we probably should have done [sic].... Do [this project] in Goshen. Do it in Warwick. Do it in Montgomery. Find a building there. Do it in some other community that has not contributed to the extent, not even close to what Middletown has contributed in

regards to participation and human service programs.

He later added that "I told [the head of RECAP] two or three years ago that he would have trouble getting that type of project through the City; that this City has done more than its share." ·

Other City officials made similar comments. Alex Smith, counsel to the Planning Board, asked at the September 1994 hearing: "Does it make more sense to have a facility in Newburgh and Greenville [two other Orange County communities], or maybe we should have two in Newburgh. I think this Board has the right to make those kinds of value judgments." He later expressed concern that the City had no guarantee that "these people [RECAP's clients] would or would not have criminal histories." He also echoed Mayor DeStefano's view that "[t]he problem is that ... there seems to be a tremendous over-concentration of these types of facilities [i.e., halfway houses] in this City as compared to the surrounding townships." At the November hearing, the City's Director of Economic and Community Development told the Planning Board that "if the [Formisano] building is occupied by a certain type of social service or support service program, perhaps occupying the building next door will be deterred."

The evidence suggests that the Planning Board members may have been similarly motivated. One board member said: "The question that we're all wrestling with ... is if this is very wide spread [sic] in our society and there's a great need for this everywhere, as we will all admit, why do we have to have all the treatment facilities right here in Middletown?" At the end of the September hearing, the chairman of the Planning Board concluded that "[t]here's a need for this project. There's some issues [sic] about whether it should be in Middletown, and that's what it boils

down to...." Before the final vote in December, the chairman recommended that the Planning Board deny RECAP a special-use permit because "there's an over-concentration of residential and social service facilities in the City." When he cast his vote, yet another board member remarked: "I believe that the City itself has extended itself and embraced significant other services that have come our way, and I have to say that for us to be the magnet for the area is not necessarily the best industrial development of this or any other project." This evidence more than suffices to establish the plaintiffs' prima facie case.

Second, as the district court correctly determined, the defendants met their subsequent burden of production, *see Reeves*, 530 U.S. at 142, 120 S.Ct. 2097, by articulating legitimate, non-discriminatory reasons for their denial of the Formisano property permit. They maintain that they denied RECAP a special-use permit in order to preserve the land along the O & W railroad line for industrial development and also to protect the halfway house residents from the nuisance effect of the railroad.

We disagree, however, with the district court's third conclusion: that the plaintiffs did not introduce evidence that raises a genuine issue of material fact as to whether the defendants' proffered reasons were a pretext for unlawful discrimination. To establish such pretext, in addition to the evidence that supports their prima facie case, the plaintiffs rely on three categories of evidence: (1) the granting of a special-use permit for the Rowley property, (2) deposition testimony, and (3) a map of the surrounding area. A review of the record on appeal indicates at a minimum that this evidence casts doubt on the defendants' proffered reasons for denying RECAP a special use permit.

At the August 1994 hearing, the Planning Board approved a special-use permit for the Rowley property, where RECAP intended to build a childcare facility. In December 1994, the Board rejected RECAP's application for a special-use permit for the Formisano property, where RECAP intended to establish the halfway houses. The applications for both properties were made at the same time, by the same entity, for adjoining properties; the principal difference between them seems to be the people whom the projects sought to serve: The Rowley property would serve children, and the Formisano property would serve recovering alcoholics. The plaintiffs argue persuasively that if industrial growth and development were the Planning Board's true concerns, then the Board would have also raised the issue in connection with the Rowley property. Indeed, the two-and-one-half acre Rowley property is five times the size of the Formisano property; it has a rail spur that connects it to the O & W track; and it is zoned for heavy rather than light industrial use. For these reasons, it arguably would be more attractive than the Formisano property for industrial use.

The district court found that "[t]he Head Start program to be conducted on the Rowley property involves a non-residential facility operating only in daylight hours, which would provide support services that would facilitate desired industrial development." *Reg'l Econ. Cmty. Action Program, Inc.*, slip op at 14. We find no support for the conclusion that the Head Start program would facilitate industrial development. The defendants provide no evidence, for example, that industrial workers' children would be eligible for a Head Start program. *Cf. Head Start 2001 Poverty Guidelines, at http://www.headstartinfo.org/publications. htm* (last modified Oct. 31, 2001) (detailing

income restrictions for Head Start children's families).

The plaintiffs also introduced evidence that calls into question the defendants' second proffered reason for denying RECAP a special-use permit: to protect the halfway house residents from the nuisance effect of the railroad. The evidence indicates that at the time of the Planning Board's decision, trains rarely traveled on the O & W line; when they did, it was at very low speeds. A reasonable juror might wonder why the Planning Board worried more about the impact of the railroad on recovering alcoholics than on the children whom it knew would be receiving education, medical attention, and other social services at the adjoining Rowley property. More generally, a juror could infer that if the industrial development and railroad-nuisance concerns led the Planning Board to deny RECAP the special-use permit for the Formisano property, then these same concerns would have led the Planning Board to deny it a special-use permit for the Rowley property. These inferences could establish that the Planning Board's disparate treatment of these two properties demonstrates intentional discrimination against recovering alcoholics and that its stated concerns about the Formisano property were pretextual.

The Planning Board members' deposition testimony provides additional evidence of pretext. When questioned about the reason for the Board's disparate treatment of the two properties, one member testified: "I cannot recall what I thought at the time, what other people thought at the time and in what detail the economic development argument began to figure in. So I can't really recall specifically what the distinction was." That same member also testified that "the concern that Middletown had a high number of treatment facilities in general was certainly brought home to

me, was certainly a recurring theme in this overall discussion." Another Planning Board member stated that he was not concerned with industrial or commercial development in relation to the Rowley property permit.

Finally, the plaintiffs supplied the district court with a map of the area as it existed in 1994. The map appears to show that the area surrounding the properties in question was not largely industrial. If true, this may cast doubt in jurors' minds upon the defendants' assertion that they sought to "preserve" it as an industrial area.

Based on this evidence, then, a reasonable juror could refuse to credit the defendants' stated reasons for denying RECAP a special-use permit and find that the real reason was discrimination based on the identity of RECAP's clients. The evidence also would suffice to permit a rational juror to find that the defendants denied RECAP the permit *solely* because of RECAP's clients' disabilities—the more demanding finding required for the plaintiffs to make out a cause of action under the Rehabilitation Act. We therefore hold that the district court erred by granting summary judgment to the defendants on each of the three statutory claims.

### B. Disparate Impact Theory

RECAP also asserts a cause of action under the FHA and ADA because the Planning Board's denial of the special-use permit had a "disparate impact" on people with disabilities. The FHA and the ADA provide relief not only from policies adopted and actions taken with a discriminatory intent, but also from the application of facially neutral standards that have an unlawful discriminatory effect upon a protected class. *See LeBlanc–Sternberg,* 67 F.3d at 425; *Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 933–

34 (2d Cir.1988). We agree with the district court, however, that in the present case, as a matter of law, the defendants' actions cannot give rise to a disparate impact claim.

 "A disparate impact analysis examines a facially-neutral policy or practice, such as a hiring test or zoning law, for its differential impact or effect on a particular group." *Huntington Branch, NAACP,* 844 F.2d at 933. To establish a prima facie case under this theory, the plaintiff must show: "(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." *Gamble v. City of Escondido,* 104 F.3d 300, 306 (9th Cir. 1997) (internal quotation marks and citation omitted); *see also Huntington Branch, NAACP,* 844 F.2d at 934.

For example, a handicapped person might challenge a zoning law that prohibits elevators in residential dwellings. That neutral law might have a disproportionate impact on such a plaintiff and others with similar disabilities, depriving them of an equal opportunity to use and enjoy dwellings there. Here, by contrast, RECAP does not challenge a facially neutral policy or practice; it challenges one specific act: the denial of a special-use permit for the Formisano property. No comparison of the act's disparate impact on different groups of people is possible. RECAP therefore fails to allege a cognizable cause of action under a disparate impact theory, and the district court correctly granted the defendants summary judgment on this claim.

*C. Reasonable Accommodation Theory*

 For similar reasons, RECAP and the United States fail to state a claim upon which relief can be granted under a reasonable accommodation theory. A municipality discriminates in violation of the FHA, the ADA, or the Rehabilitation Act if it refuses to make changes to "traditional rules or practices if necessary to permit a person with handicaps an equal opportunity to use and enjoy a dwelling." *Shapiro v. Cadman Towers, Inc.,* 51 F.3d 328, 333 (2d Cir.1995) (quoting H.R.Rep. No. 711, 100th Cong., 2d Sess. (1988), *reprinted at* 1988 U.S.C.C.A.N. 2173, 2186). Returning to the example of the zoning ordinance prohibiting elevators, a proper reasonable accommodation claim might assert that the zoning authority should have waived or modified its rule against elevators in residential dwellings to permit those who need them to use them and thereby have full access to and enjoyment of residences there. *See Salute v. Stratford Greens Garden Apartments,* 136 F.3d 293, 301–02 (2d Cir.1998) (providing examples of typical accommodation cases).

Here, however, the zoning rules do not prohibit the proposed halfway houses in the first place. The plaintiffs do not seek a variance to a traditional rule or practice that was neutrally applied. Rather, they challenge the defendants' specific decision to deny RECAP a special-use permit for discriminatory reasons. The plaintiffs' argument in this case is that the Planning Board determined that the planned use would have an adverse effect on the neighborhood because of an illegitimate reason, the identity of the group of users. Because the plaintiffs do not point to the prerequisite neutral application of a rule, they fail to state a claim under a reasonable accommodation theory.

V. The Retaliation Claim

 Finally, RECAP alleges that the defendants retaliated against it for threatening to complain and actually complaining about the denial of the permit by with-

drawing funds committed to it by the City for a different project. We conclude that this allegation states a claim against the City and DeStefano.

 Under the FHA, it is unlawful, "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by [*inter alia,* section 3604] of this title." 42 U.S.C. § 3617. The ADA and Rehabilitation Act include similar prohibitions. *See* 42 U.S.C. § 12203(b); 29 U.S.C. § 791(g). We apply the *McDonnell Douglas* burden-shifting rules to claims of retaliation pursuant to these statutes. *See Sarno v. Douglas Elliman–Gibbons & Ives, Inc.,* 183 F.3d 155, 159 (2d Cir.1999); *Richardson v. N.Y. State Dept. of Corr. Serv.,* 180 F.3d 426, 443 (2d Cir.1999). RECAP therefore must first establish a prima facie case of retaliation. *Richardson,* 180 F.3d at 443. It must show "that [it was] engaged in protected activity, that the [defendant] was aware of this activity, that the [defendant] took adverse action against the plaintiff, and a causal connection exists between the protected activity and the adverse action, *i.e.,* that a retaliatory motive played a part in the adverse employment action." *Sands v. Runyon,* 28 F.3d 1323, 1331 (2d Cir.1994) (discussing the elements of a retaliation claim under the Rehabilitation Act) (internal quotation marks omitted); *see also Weissman v. Dawn Joy Fashions Inc.,* 214 F.3d 224, 234 (2d Cir.2000) (discussing the elements of an ADA retaliation claim); *San Pedro Hotel Co., Inc. v. City of Los Angeles,* 159 F.3d 470, 477 (9th Cir.1998) (discussing the elements of a FHA retaliation claim).

 RECAP elicited sufficient evidence to support a prima facie case of retaliation against the City and DeStefano. RECAP's letter dated December 5, 1994, and its filing of a complaint with the HUD were protected activities. Both constitute "oppos[ition to] an[ ] act or practice made unlawful" by the applicable anti-discrimination statutes. 42 U.S.C. § 12203(a); *see also Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 566 (2d Cir.2000) (defining protected activity as "action taken to protest or oppose statutorily prohibited discrimination"). The defendants do not assert that they were unaware of this activity. RECAP suffered an adverse action in losing funding that had been committed to it, and the events leading to the ultimate loss of funding began very shortly after RECAP's protected activity.

 "The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Cifra v. Gen. Elec. Co.,* 252 F.3d 205, 217 (2d Cir.2001) (citation and internal quotation marks omitted). We "ha[ve] not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship . . . ." *Gorman–Bakos v. Cornell Coop. Extension,* 252 F.3d 545, 554 (2d Cir.2001). An inference of a causal relationship might be made based on Smith's comment to Figueroa that RECAP should not "bite the hand that feeds it." While the ultimate denial of funding did not occur immediately after the protected activity, a reasonable juror could conclude that the defendants withdrew RECAP's funding because of the events following the denial of the Formisano property permit.

 The defendants proffer two legitimate, non-retaliatory reasons for the withdrawal of funds: (1) the funding was only available for a limited time period; and (2)

RECAP employed banned contractors. RECAP presents sufficient evidence to raise a material issue of fact as to whether these proffered reasons were a pretext for retaliation. We note, moreover, that the defendants offer no evidentiary support for the non-retaliatory reasons they proffer, and we find no indication in the record that the funding was only offered for a limited time. We further note that although RECAP responded to the defendants' expressed concerns about the project, the defendants neither answered this response nor indicated that the issue that gave rise to it continued to concern them. A reasonable juror could conclude that the defendants are now citing these reasons in order to obscure their retaliatory motive. We therefore hold that summary judgment should not have been granted on RECAP's retaliation claim against the City and DeStefano.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion.