**Risa A. BENETTE, et al., Plaintiffs,**

v.

**CINEMARK U.S.A., INC., d/b/a Movies 10, Defendant.**

**No. 01–CV–6519L.**

United States District Court, W.D. New York.

Nov. 21, 2003.

246

Nira T. Kermisch, Rochester, NY, for Plaintiffs.

Daniel J. Moore, Harris Beach LLP, Pittsford, NY, for Defendant.

### DECISION AND ORDER

LARIMER, District Judge.

### INTRODUCTION

Plaintiff Risa Benette brought this action against defendant Cinemark U.S.A., Inc. d/b/a Movies 10 ("Cinemark") asserting a claim for hostile work environment based on sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Plaintiff Roberto Rodriguez brought this action against Cinemark asserting a claim for hostile work environment based on disability, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"). Plaintiffs also assert that Cinemark retaliated against them after they complained to Cinemark about the hostile work environments and filed charges of discrimination with the New York State Division of Human Rights ("SDHR").

Before the Court is Cinemark's motion for summary judgment (Dkt.# 12). For the reasons set forth below, Cinemark's motion is granted in its entirety.

### I. Benette's Claims

#### A. Hostile Work Environment

In order to prevail on a claim that sexual harassment has caused a hostile work environment in violation of Title VII, a plaintiff must establish two elements. First, plaintiff must show that her workplace was permeated with "discriminatory intimidation, ridicule, and insult ... that [wa]s sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotation marks and citations omitted). Second, plaintiff must show that a specific basis exists for imputing the conduct that created the hostile environment to the employer. *Mack v. Otis Elevator Co.*, 326 F.3d 116, 122 (2d Cir.2003); *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir.2002); *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir.1997).

To meet the first requirement, plaintiff must demonstrate "either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir.2000) (internal quotation marks omitted). Plaintiff must establish that the environment was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

In *Harris*, the Supreme Court set forth a non-exhaustive list of factors relevant to determining whether a given workplace is permeated with discrimination so "severe or pervasive" as to support a Title VII claim. These include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a "mere offensive utterance"; (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted to the plaintiff. *Harris*, 510 U.S. at 23, 114 S.Ct. 367.

The Second Circuit has instructed that the Court should consider the totality of the circumstances in determining whether plaintiff has submitted evidence sufficient to support a finding that a hostile work environment relating to discrimination existed. *See Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir.1997) (citing *Harris*, 510 U.S. at 23, 114 S.Ct. 367). Thus, the factors outlined above must be considered "cumulatively," so that the Court can "obtain a realistic view of the work environment." *Id.* (quoting *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 444 (7th Cir.1994)). This includes evaluating the "quantity, frequency, and severity" of the incidents. *Id.* (citing *Vore v.*

*Indiana Bell Tel. Co.*, 32 F.3d 1161, 1164 (7th Cir.1994)).

Applying these principles, I find that Benette's claim for hostile work environment must fail. Benette's claims principally relate to the language used by Derek Jones, her supervisor, an African–American male. There is no evidence in the record that Jones's conduct occurred because Benette was a woman. Although there is evidence of rude, boorish behavior by Jones, there is insufficient evidence that such conduct occurred because of Benette's gender or that she was treated any differently with respect to offensive language than her male counterparts. Moreover, when the Court views Benette's complaints and Jones's conduct in the context of the overall work environment that existed at Cinemark at the relevant time, there is little evidence of a gender-based or sexually-charged hostile work environment.

Jones was appointed General Manager of Movies 10 Theater in September, 1997. Both Benette and Rodriguez worked at the same theater as assistant managers. Jones was not a popular choice as general manager, at least among a cadre of employees. The former Acting General Manager, a woman, was passed over for the job of General Manager. She was preferred by Benette and other employees, and they did little to hide their dissatisfaction with Jones's appointment.

Brian Chapin, an employee at the theater, advised Cinemark managers, when addressing complaints about Jones, that Benette had decided she did not like Jones before he even assumed his duties because she believed that he should not have received the Manager's job. Benette even discussed activities that might get Jones fired. (Statement of Brian Chapin, Ex. 11, Statement of Facts Not In Dispute [hereafter "Statement of Facts"] ). According

to Chapin, Benette claimed that Jones got preferential treatment because he was black. Chapin described an intense "rivalry" between Jones and Benette at the theater. Benette denies that she held any animus towards Jones or believed that he received preferential treatment because of his race. She claims the former Acting General Manager and Chapin held these beliefs instead. Further, she denies discussing or planning activities that would get Jones fired, and claims that at one point during the investigation she actively discouraged Jones from resigning. (Deposition of Benette at pp. 69–74, Ex. 4, Statement of Facts; Benette Aff. at 57–62, Dkt. #25).

Although there is some dispute regarding the infighting among the managers at Cinemark, Cinemark does not dispute that Jones engaged in the conduct about which Benette complains. Benette's primary complaints about Jones related to his vulgar and offensive language. Jones's vocabulary was peppered with invective against most employees and his own supervisors. Jones described the former acting general manager (a female) as "fucking ugly" and a "whore." He described his own supervisor, Charly Street (a male), as a "fucking asshole" and a person who "kisses corporate ass." Jones also frequently used the word "fuck" when speaking to employees and was often rude and abrupt with certain employees. This invective and Jones's rude behavior occurred in the presence of customers of the theater as well. In her letter to management describing Jones's behavior, Benette describes Jones's use of foul language within earshot of customers. (Ex. 13, Statement of Facts).

Although Benette described the foul language, it appears that none of the profane language was directed to Benette in her presence. After Benette complained to Cinemark officials about Jones's behavior,

she overheard him through the wall of Jones's office describe her to another assistant manager as a "fucking asshole" and a "trouble-making bitch." (Ex. 13, Statement of Facts).

There were also inappropriate comments made about other female employees and their anatomy. Benette claims she heard Jones refer to another female as having a "nice ass." Benette was also told that Jones had commented to another male employee that Benette had "big tits." Finally, Benette was told by a fellow male employee, Kocienski, that Jones had made certain lascivious comments relating to that male employee having sex with a particular female employee who Jones referred to as a "dog." Jones also asked Kocienski whether he an Benette were having a sexual relationship.

Because of Jones's conduct, Benette complained directly to Cinemark. Benette called Charly Street, a regional manager, and complained about Jones's conduct and his language. (Deposition of Benette at p. 88–96, Ex. 4, Statement of Facts). Because of these complaints, an investigator from Cinemark was sent to Rochester to interview all of the affected employees. In the process, Benette submitted a detailed, seven-page summary concerning the conduct that she found offensive (Ex. 13, Statement of Facts). In that letter, Benette described Jones as "unprofessional." She noted that he used rude and derogatory language with employees. She described Jones's use of vulgar and profane language concerning his superiors and the employees at the theater. She complained that Jones showed favoritism toward certain employees and was harsh to those he did not favor. In this submission though, Benette did *not* claim that the actions she complained of were taken against her on account of her gender, or that she had

been treated different than male employees.

The investigator sent by Cinemark, Mario Gonzalez, interviewed eighteen employees, including Jones. Jones denied the allegations against him and claimed that his accusers had engaged in misconduct themselves (Ex. 15, Statement of Facts). Gonzalez's report noted problems with Jones's conduct and other employees at the facility, including Benette. (Ex. 12, Statement of Facts). Gonzalez's conclusion was that Jones was guilty of using "inappropriate language" and conducting himself in an unprofessional manner toward customers and employees. But, he also found fault with Benette and others.

The conclusion to Gonzalez's report contained the following summary:

In interviewing the assistant managers at Movies 10, it was obvious that there is a problem between them and Jones. For whatever reason, they dislike each other. The assistants that complained against Jones seemed to be doing everything possible to make it hard to work with him. They reported that Jones uses inappropriate language, and he admitted that he has used bad language, but claimed they are just as guilty. When I interviewed assistant managers from Tinseltown Movies 16 [the site of Jones's prior employment], Jones has had a history [of] inappropriate language and conducting himself [in an] unprofessional [manner]. . . . I also believe that ... Rodriguez and Benette have instigated many of the problems that exist, and are responsible for not getting along with Jones, or allowing the operation of the theater to function as smooth as it should be. (Ex. 12, Statement of Facts).

Based on the investigation, Jones was counseled and given a written reprimand concerning use of abusive language and engaging in unprofessional behavior. (Ex. 17, Statement of Facts). He was placed on "probation" and warned that "immediate termination" would result if the conduct continued.

Benette complained again to Street about Jones. (Ex. 20, Statement of Facts). Cinemark responded and sent another investigator, Danny Myers, who conducted interviews and concluded that much of what Benette had reported should be discounted. (Ex. 21, Statement of Facts). According to Myers' report, Jones's behavior had improved "a lot." According to Myers, the majority of assistant managers acknowledged Jones's improvements. Although Benette had marshaled several complaints, when the affected employees were contacted, they had no direct personal knowledge of the matters at issue. According to Myers, even Benette acknowledged that Jones's behavior had improved "since they sat down and talked through their issues." In fact, Benette had apparently called Street and told him that it was unnecessary to send Myers to conduct the investigation. (Ex. 21, Statement of Facts).

On January 14, 1998, Benette, together with Rodriguez and Kocienski, filed separate claims of discrimination with the State Division of Human Rights ("SDHR") (Exs. 32, 33, 34, Statement of Facts). All of the claims related to the language and conduct of Derek Jones. Benette claimed discrimination on account of her gender and for retaliation for complaining about discrimination. (Ex. 32, Statement of Facts). Kocienski complained of discrimination on account of his gender (male) and retaliation. (Ex. 33, Statement of Facts). Rodriguez claimed discrimination on account of a disability and for retaliation. (Ex. 34, Statement of Facts).

After conducting an investigation, the SDHR found no probable cause that Cinemark engaged in discriminatory conduct as

to any of the complainants. (Exs. 37, 38 and 39, Statement of Facts). The SDHR examined Benette's hostile work environment claim in depth. It found that Jones's language was vulgar but determined that his behavior was not based on gender. It found that the incidents lacked any "sexual intent or motivation" (Ex. 38, p. 2, Statement of Facts) and did not rise to the level of "severity and pervasiveness" as to constitute sexual harassment. The SDHR noted that the respondent company promptly investigated Benette's complaints and took disciplinary action against Jones for his "disrespectful attitude" toward employees and customers. (Ex. 38, p. 3, Statement of Facts). In addition, the SDHR found fault on Benette's part, as well. The SDHR noted the following concerning Benette's actions:

> The investigation revealed strong evidence from different employees, which were not effectively rebutted by the Complainant [Benette], that she herself, engaged in behaviors that appear orchestrated at undermining the new manager, for personal reasons. The record shows incidents of Complainant calling co-workers derogatory names because they would not participate in backing her in her claiming sexual harassment against the manager .... The investigation revealed that the staff at the theater was demoralized for some time, even before arrival of Derek Jones, and that there was infighting among the assistant managers, including the complainant, which had a detrimental effect on the theater's operations.... The division notes information in the record that Risa Benette and Rodriguez had a racial bias against the manager because he is black ...

 I find, as did the SDHR, the conduct complained of here is not sufficient to constitute a "hostile work environment" as that term is defined in the law of employment discrimination. First of all,

"hostile" work environment has a particular meaning in the field of employment discrimination. The conduct is deemed "hostile" if it relates to discriminatory conduct, *i.e.* involves treating a particular employee or class of employees different than others. A "hostile" work environment is not synonymous with an unpleasant, harsh, combative or difficult work environment. The nation's workplace is most likely populated with abusive, banal, profane and vulgar supervisors. No doubt they, like Jones, use insensitive, profane and vulgar language toward employees. Such evidence, though, is insufficient to make out a claim for discrimination. In assessing hostile work environment claims, the Court must be mindful that "Title VII is not a 'general civility code.'" *Bickerstaff v. Vassar College,* 196 F.3d 435, 452 (2d Cir. 1999) (citing *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). Although Title VII "protects employees from improper discriminatory intimidation[,] it does not reach so far as to protect plaintiffs from undiscriminating intimidation by bullish and abusive supervisors." *Curtis v. Airborne Freight Corp.,* 87 F.Supp.2d 234, 250 (S.D.N.Y.2000). Rather, plaintiff must produce evidence that she was treated differently than others because of her sex. *Oncale,* 523 U.S. at 79–80, 118 S.Ct. 998.

What becomes apparent after reviewing the record is that Jones uttered his vulgarities to most people that he came into contact with, both male and female alike. There is no evidence that Jones would have treated Benette any differently concerning his language if she had been a male. "[I]n the absence of evidence suggesting that a plaintiff's sex was relevant, the fact that both male and female employees are treated similarly, if badly, does give rise to the inference that their mistreatment shared a common cause that was unrelated to their sex." *Brown v.*

*Henderson*, 257 F.3d 246, 254, (2d Cir. 2001). Although Benette described many instances of tasteless use of vulgar language by Jones, including repeated use of the word "fuck," the record shows that Jones used this language to all who were in earshot, irrespective of their gender. In addition, Jones did not limit his derogatory remarks to women. In her statement to Cinemark complaining of the conduct, Benette describes Jones's use of profanity when referring to male managers. (Ex. 13, Statement of Facts). The evidence is clear that Jones's conduct was not occasioned by the gender of the recipient of his invective. Importantly, "this inference is not necessarily eliminated even if some of the harassment has sexual content." *Id.* at 254 (citing *Butler v. Ysleta Ind. Sch. Dist.*, 161 F.3d 263, 270–71 (5th Cir.1998) (affirming grant of summary judgment to defendants where a school principal sent lewd and insulting letters to both men and women)); *see also Petrosino v. Bell Atlantic*, No. 99 CV 4072, 2003 WL 1622885 (E.D.N.Y. Mar.20, 2003) (granting summary judgment on sexual harassment hostile work environment claim where there was no evidence that foul language and sexually explicit graffiti that depicted men and women, including plaintiff, were motivated by plaintiff's sex).

■ Plaintiff has failed to establish the requisite discriminatory animus to constitute a viable hostile environment claim. Although direct evidence of discriminatory animus is not necessary to survive summary judgment, plaintiff must produce at least some circumstantial evidence that shows discriminatory animus. *See Schwapp*, 118 F.3d at 110. Here, as clarified at oral argument, Benette relies on the fact that Jones used certain profane words that have a sexual connotation. However, this is not enough to prove dis-crimination based on sex. In this regard, the Supreme Court has held:

> Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion] ... because of ... sex.' We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations. 'The critical issue, Title VII indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'

*Oncale*, 523 U.S. at 80, 118 S.Ct. 998 (citations omitted).

■ In any event, even if there was evidence suggesting that Jones's actions were based on Benette's sex, the conduct described above is insufficient to meet the objective component of a hostile work environment claim. Considering the factors to determine whether actions are sufficiently severe or pervasive to be actionable under Title VII, I find that Jones's conduct does not rise to the requisite level. The incidents occurred over a relatively short period of time, just over three months.[1] Although there is no threshold time period a plaintiff must surpass to make out a hostile work environment claim, three months is insufficient given the nature of the conduct here. Importantly, no one incident described by Benette is sufficiently severe itself to be actionable. *See Alfano*, 294 F.3d at 380. Rather, the majority of the offensive conduct is the boorish or offensive use of language by Jones in everyday conversation.

Furthermore, most of the incidents were not directed at Benette herself or they did

---

**1.** Jones began working at Movies 10 on September 24, 1997. Benette took a new posi-tion at a different theater on January 14, 1998.

not happen in her presence. Instead, Jones's comments were heard "second-hand" through other employees or his conduct was directed at other employees at Cinemark. Here, the so-called hearsay harassment and comments directed at others make up the majority of the conduct about which Benette complains. In fact, the record does not reveal a single comment or incident by Jones with a sexual connotation directed at Benette that occurred in her presence.

In sum, Benette has not produced sufficient evidence that the workplace environment was permeated with such discriminatory intimidation, ridicule, and insult based on her sex that a reasonable person would find that the terms and conditions of employment were altered. *See Kotcher v. Rosa & Sullivan Appliance Ctr.*, 957 F.2d 59, 62 (2d Cir.1992) ("The incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief."); *Hayut v. State Univ. of New York*, 217 F.Supp.2d 280, 287 (N.D.N.Y.2002) (applying Title VII standards to educational setting and holding that "sporadic use of abusive language, gender related jokes, or occasional episodes of harassment will not constitute actionable hostile educational environment."); *see also Alfano*, 294 F.3d at 379–81 (collecting cases) (reversing jury verdict for plaintiff on hostile work environment claim where five incidents were not sufficient to meet severity or pervasiveness standard); *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 872–75 (5th Cir.1999) (summary judgment granted on hostile work environment claim, where,

in a two-year period, coworker made lewd comments about plaintiff's anatomy, tried to look down her shirt, and touched her numerous times); *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 823–24 (6th Cir.1997) (granting judgment as a matter of law after trial to employer on hostile work environment claim where repeated sexual jokes and no fewer than five other sexually offensive remarks were made in a four-month period); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430–31 (7th Cir. 1995) (nine sexually offensive incidents in a seven-month period, including repeated references to plaintiff as a "pretty girl," grunting noises when plaintiff wore a particular skirt, and an episode of simulated masturbation did not create an objectively hostile environment). As such, Cinemark is entitled to summary judgment on Benette's hostile work environment claim.[2]

## B. Benette's Retaliation Claim

Benette also alleges that Cinemark retaliated against her. In January 1998, Benette asked for and was granted a promotion to a position at another theater in Rochester (Tinseltown) as the Supervisor of Janitorial Services. Her pay increased and she took on greater responsibilities. In spite of this promotion, Benette claims that Cinemark retaliated against her in her new position because she previously complained about Jones's conduct to management and to the SDHR. I find insufficient evidence of such conduct.

Claims of retaliation are analyzed under the familiar *McDonnell Douglas* burden-

---

**2.** To prevail on her claim, Benette must also show that she subjectively perceived Jones's conduct as being hostile and abusive such that it altered the conditions of her working environment. Here, however, the record shows that during the investigation by Cinemark into Jones's conduct, Jones indicated that he wanted to resign. Plaintiff admitted at her deposition that she encouraged him not

to do so, stating that his resignation would not have solved the problem. (Deposition of Benette at pp. 144–45, Ex. 4, Statement of Facts). Although the Court does not reach this issue, I have grave doubts about whether Benette could prove the subjective component of the hostile work environment claim based on this record.

shifting rules. *Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 443 (2d Cir.1999). To make out a *prima facie* claim for retaliation, a plaintiff must show: (1)that she participated in a protected activity; (2) that the defendant knew of the protected activity; (3) that she suffered an adverse employment action; and (4) that a causal connection exists between plaintiff's protected activity and the adverse employment action. *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 113 (2d Cir.2000). Once plaintiff makes out a *prima facie* case of retaliation, the burden shifts back to the employer to show that there was a legitimate, non-retaliatory reason for its actions. If the employer meets its burden, the burden shifts back to the plaintiff to show that "there is sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext for impermissible retaliation." *Richardson*, 180 F.3d at 443 (citing *Gallagher v. Delaney*, 139 F.3d 338, 348 (2d Cir.1998)). Here, the parties do not dispute that plaintiff engaged in protected activity or that Cinemark knew of that activity. I find that Benette has failed to establish that the legitimate reasons advanced by Cinemark for the alleged adverse actions were merely a pretext for impermissible retaliation. Benette has failed to establish any causal connection between the adverse actions and the complaints that she made several months earlier against Jones.

 Benette claims that she was eventually fired by Cinemark and, prior to that, the conditions of her employment at the new theater were made onerous and difficult. I find neither situation to constitute retaliation. First of all, Benette was one of over one hundred janitorial employees that were laid off by Cinemark in June, 1998 when the company decided to use outside contractors rather than employees for its janitorial services. Benette does not dispute that the layoff occurred and that approximately one hundred co-workers were also terminated. Plaintiff has failed to offer any admissible evidence to suggest that this broad reduction in force was occasioned by Benette's complaints several months earlier about Jones. Plaintiff has failed to establish any causal connection whatsoever.

 Benette also claims that retaliation occurred when limitations were placed on her work in her new position at Tinseltown. Specifically, she objects to the fact that the keys to the office at the theater were taken from her. As for Benette's allegations that Cinemark made her new job difficult, plaintiff has submitted her own affidavit and that of her former supervisor at Tinseltown, Ted Jackson, explaining why, in the context of this job, taking her keys away could be considered adverse. (Dkt.##25 & 27). Jackson explained that he and Benette used the office to do paperwork, to contact employees when they did not show up for work, to prepare schedules and new hire packages, to discipline employees in private, and to call 911 in case of an emergency. Assuming, without deciding, that taking Benette's keys to the office and the theater could be considered adverse employment actions sufficient to state a *prima facie* case, Cinemark has provided satisfactory non-retaliatory reasons for its conduct. (*See* Dkt. # 30, ¶¶ 45–64).

Shortly after Benette took the new position, the Democrat and Chronicle published an article rating area theaters. Tinseltown was given very poor ratings in the area of theater and restroom cleanliness. After investigating these reports with the Tinseltown's general manager, Cinemark learned that managers were using the office as a "late night hang out" instead of supervising the larger janitorial staff. Street was surprised that the janitorial managers at Tinseltown had access to the

office because it was not company policy to allow office access. Of the twenty-three other theaters in the Northeast Region, twenty-two did not provide office access to janitorial staff. Therefore, Jackson was instructed to retrieve the office keys from Benette so as to come into compliance with company policy. Also, Cinemark asserts that Benette did not need keys to the theater itself do her job because she was required to be at the theater before it closed and was let in by the daytime staff.

Having found that Cinemark met its burden of offering legitimate non-retaliatory reasons for its conduct, the burden shifts to Benette to produce some evidence that the proffered reasons are merely a pretext for discrimination.

I find that Benette has failed to show that "there is sufficient potential proof for a reasonable jury to find the proffered legitimate reasons merely a pretext for impermissible retaliation." *Richardson,* 180 F.3d at 443. No reasonable jury could find on this evidence that the reasons for taking her keys away or terminating her were pretextual. The evidence advanced by Benette is insufficient to raise a jury issue concerning the legitimacy of the proffered reasons. All that we have, essentially, is Benette's own speculation that her termination and job restrictions were caused by the complaint she lodged earlier. Such speculation is insufficient. Plaintiff has failed completely to make any showing of a causal connection between the job action and her prior complaints. Therefore, the retaliation claim must fail.

## II. Rodriguez's Claims

### A. Hostile Work Environment Claim Under the ADA

Plaintiff, Roberto Rodriguez, claims that he was discriminated against because of a disability—a hearing impairment. He claims that his supervisor, Jones, created a hostile work environment by ridiculing him

and not accommodating his disability by not speaking more clearly or repeating himself when necessary. Rodriguez claims that Jones frequently called him "the deaf one" and otherwise derided him by calling him a "deaf fucking idiot." Jones apparently complained to others about having to work with Rodriguez and Rodriguez claims Jones deliberately spoke softly to frustrate Rodriguez. This claim must be dismissed.

The Second Circuit analyzes claims of intentional discrimination under the ADA also using the *McDonnell Douglas* burden-shifting analysis. *See Regional Economic Community Action Program, Inc. v. City of Middletown ("RECAP"),* 294 F.3d 35, 48–49 (2d Cir.2002). Thus, the initial burden is on plaintiff to establish a *prima facie* case. *Id.* To demonstrate a *prima facie* case of employment discrimination under the ADA, a plaintiff must show: (1) that he is an individual with a disability within the meaning of the ADA; (2) that his employer is subject to the ADA and had notice of the disability; (3) that the plaintiff was otherwise qualified to perform the essential functions of his position, with or without reasonable accommodation; and (4) that he was fired or suffered adverse employment action because of the disability. *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.,* 198 F.3d 68, 72 (2d Cir.1999); *Reeves v. Johnson Controls World Serv.,* 140 F.3d 144, 149–50 (2d Cir. 1998); *Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 869–70 (2d Cir.1998). The Court finds that Rodriguez's ADA claim must fail because did not establish that he is disabled within the meaning of the ADA.

■ The ADA defines "disability" as: "a physical or mental impairment that substantially limits one or more of the major life activities of such individual"; "a record of such an impairment"; or "being regarded as having such an impairment." 42

U.S.C. § 12102(2). Here, plaintiff alleges that he is disabled under the first definition because he has a hearing impairment.[3] There is no dispute that hearing is a major life activity *per se*. *See Reeves,* 140 F.3d at 152 (noting that the Courts and the EEOC treat hearing as major life activities *per se* ); *see also* 29 C.F.R. § 1630.2(i) (major life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working"). Therefore, whether Rodriguez is disabled within the meaning of the ADA turns on whether his impairment substantially limits his ability to hear. *See Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 195–97, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002) ("To qualify as disabled, a claimant must ... show that the limitation on the major life activity is 'substantia[l]' ").

A major life activity is substantially limited when an individual cannot perform an activity that an average person in the general population could perform, or faces significant restrictions in the "condition, manner, or duration under which the individual can ... perform [the] activity." 29 C.F.R. § 1630.2(j)(1)(i)-(ii). To determine whether an impairment substantially limits a major life activity, the regulations suggest that the following factors be considered: (i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2).

Here, Rodriguez has submitted no evidence that his hearing impairment substantially limits his ability to hear. In fact, there is scant evidence in the record regarding Rodriguez's hearing impairment at all to which the Court can apply the factors outlined above. Rodriguez produced no evidence regarding the duration or permanency of his impairment. The only evidence regarding the nature and severity of his impairment comes from ambiguous descriptions in his deposition testimony and affidavit.

At his August 2002 deposition, Rodriguez was asked how his hearing affected his ability to hear conversations. He testified that he can hear conversations if there is no other noise in the room. If, however, there are a lot of people talking at the same time, he would have a "problem" hearing the conversation. He further testified that his impairment has never prevented him from performing any job he has held, and that he has never sought an accommodation from an employer because of his impairment. He also testified that the last time he saw a physician for his hearing was seven years earlier, in 1995. (Deposition of Rodriguez at pp. 18–19, Ex. 6, Statement of Facts).

The only medical evidence in the record regarding his impairment was filed by Cinemark and consists of an uncertified copy of an October 8, 2002, Pure Tone Audiogram Frequency test performed on Rodriguez. However, neither party (nor the medical record itself) explains the results of this exam or discusses what the exam results indicate about the nature or severity of Rodriguez's ability to hear. Furthermore, the 2002 exam results are not necessarily determinative of whether Rodriguez was disabled when he worked at Cinemark in 1997 and 1998.

As discussed above, Rodriguez has the burden of proving that he is disabled within the meaning of the ADA. He cannot meet that burden by showing merely that he has some type of hearing impairment. *See Toyota,* 534 U.S. at 195, 122 S.Ct. 681

---

**3.** At oral argument, plaintiff's counsel indicated that plaintiff was not relying on the third definition of disability—being regarded as disabled.

("Merely having an impairment does not make one disabled for purposes of the ADA."). Rather, his hearing impairment has to substantially limit his hearing. The Supreme Court has stated that " 'substantially' in the phrase 'substantially limits' suggests 'considerable' or 'to a large degree' " when defining an impairment under the ADA. *Toyota,* 534 U.S. at 196, 122 S.Ct. 681. Therefore, a hearing impairment that only mildly or moderately affects Rodriguez's ability to hear would not define him as disabled under the ADA. *Id.* at 197, 122 S.Ct. 681 ("The word 'substantial' thus clearly precludes impairments that interfere in only a minor way with [a major life activity] from qualifying as disabilities.").

Rodriguez does not allege that his impairment substantially limits his ability to hear, and the evidence summarized above is insufficient to support such a finding. Accordingly, Cinemark is entitled to summary judgment on Rodriguez's ADA claim. *Ryan,* 135 F.3d at 871–72 (affirming summary judgment to employer where employee failed to establish that disability substantially affected her ability to engage in a major life activity); *Manessis v. New York City Dep't of Trans.,* 02 Civ. 359, 2003 WL 289969, *16 (S.D.N.Y. Feb.10, 2003) (summary judgment granted to employer where plaintiff failed to produce evidence that hearing impairment was substantially limiting within the meaning of the ADA); *see also Clemente v. Exec. Airlines, Inc.,* 213 F.3d 25, 31 (1st Cir.2000) (affirming summary judgment to employer where employee produced evidence that she suffered from hearing impairment, but failed to submit evidence that her hearing

impairment substantially interfered with her ability to speak or hear).

## B. Retaliation and Constructive Discharge

To the extent that Rodriguez asserts a claim for retaliation and constructive discharge, that claim must also fail.[4] In March 1998, Jones gave Rodriguez a poor performance evaluation and an action plan regarding certain areas in which he needed improvement. The next day that Rodriguez was scheduled to work, Rodriguez fell ill and called in sick to work for one day. When Rodriguez returned to work, Jones requested that Rodriguez provide medical documentation for his absence. When Rodriguez could provide none, Jones wrote a disciplinary memo for Rodriguez and suspended him for one week. Rodriguez did not return to work after being suspended. Street contacted Rodriguez requesting that he return to work, but Rodriguez refused, claiming that Jones was retaliating against him and creating a hostile work environment.

■■ To establish a constructive discharge, plaintiff must show that his employer deliberately made his working conditions so intolerable that he was forced to resign. *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 73 (2d Cir.2000); *Stetson v. NYNEX Serv. Co.,* 995 F.2d 355, 360 (2d Cir.1993); *Pena v. Brattleboro Retreat,* 702 F.2d 322, 325 (2d Cir.1983). This burden is not an easy one to carry. The Second Circuit has held that a constructive discharge cannot be established simply through evidence that the "employee was dissatisfied with the nature of his

4. Although Rodriguez asserted a retaliation claim in his complaint against Cinemark, he did not assert that he was constructively discharged. Nevertheless, his affidavit and deposition testimony suggest that he is claiming that Jones retaliated against him by, essentially, forcing him to resign. Rodriguez included this claim in his SDHR charge. Therefore, the Court assumes that Rodriguez's retaliation claim is based on his constructive discharge.

assignments," "the employee feels that the quality of his work has been unfairly criticized," or "the employee's working conditions were difficult or unpleasant." *Stetson*, 995 F.2d at 360. Therefore, "a claim of constructive discharge must be dismissed as a matter of law unless the evidence is sufficient to permit a rational trier of fact to infer that the employer deliberately created working conditions that were 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Id.* at 361 (quoting *Pena*, 702 F.2d at 325).

I find that no rational trier of fact could conclude reasonably from these facts that the incidents about which Rodriguez complains made his working conditions so difficult or unpleasant that he felt compelled to resign. *Pena*, 702 F.2d at 325. Rodriguez claims that he quit because he could no longer tolerate the hostile work environment created by Jones and that Jones was out to get him. (Deposition of Rodriguez at p. 110, Ex. 6, Statement of Facts; Rodriguez Aff. at ¶ 71, Dkt. # 26). Specifically, he alleges that Jones gave him an undeserved negative employee evaluation and then disciplined him wrongly when he could not provide a medical excuse. However, this kind of employee concern does the not meet the stringent standard for demonstrating constructive discharge. *Stetson*, 995 F.2d at 361–62 (finding that no rational trier of fact could conclude that employee was constructively discharged where employee was dissatisfied with work assignments, believed he was being unfairly criticized, and that he was undercompensated); *Gray v. York Newspapers, Inc.*, 957 F.2d 1070 (3d Cir. 1992) (employee's subjective interpretation that continued employment would be uncomfortable and demeaning and would lead to demotion or termination in the future does not constitute constructive discharge).

It is not enough that a reasonable person would have "preferred not to continue working for that employer." *Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir.1993). Rodriguez must show that his job had become "intolerable" to the point that he was "forced into an involuntary resignation." *Pena*, 702 F.2d at 325; *Stetson*, 995 F.2d at 360 (quoting *Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1162 (3d Cir.1993) (even "hypercritical supervision" and "unfair and unwarranted treatment [are] by no means the same as constructive discharge.")). In addition, the record shows that Street contacted Rodriguez after he failed to report to work following his one week suspension and asked that he come back to Cinemark. Evidence that an employer wanted an employee to remain in its employ seriously undermines a claim of constructive discharge. *See Whidbee*, 223 F.3d at 74. Based on this record, Rodriguez cannot make the requisite showing for constructive discharge. Accordingly, his retaliation claim is dismissed.

## CONCLUSION

For the foregoing reasons, Cinemark's motion for summary judgment (Dkt.# 12) is granted and plaintiffs' complaint is dismissed in its entirety with prejudice.

IT IS SO ORDERED.