**Declan MURPHY, Plaintiff,**

v.

**BEAVEX, INC., Defendant.**

**No. 3:06CV01109(DJS).**

United States District Court,
D. Connecticut.

April 16, 2008.

William Sylvester Palmieri, New Haven, CT, for Plaintiff.

Gary S. Starr, Shipman & Goodwin, Hartford, CT, for Defendant.

## MEMORANDUM OF DECISION AND ORDER

DOMINIC J. SQUATRITO, District Judge.

The plaintiff, Declan Murphy ("Murphy"), brings this action against the defendant, BeavEx, Inc. ("BeavEx"), alleging disability-based discrimination. Murphy filed the complaint on July 19, 2006, asserting claims for relief under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq.* ("ADA"), the Connecticut Fair Employment Practices Act, Conn. Gen.Stat. §§ 46a–60 *et seq.* ("CFEPA"), and Connecticut common law.[1] Specifically, Murphy alleges that he was subjected to ongoing harassment and discrimination based on his multiple sclerosis ("M.S."), which in turn led to his constructive discharge. Now before the court is BeavEx's motion for summary judgment (dkt. # 17) pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the following reasons, BeavEx's motion for summary judgment (**dkt. # 17**) is **GRANTED.**

## I. FACTS

Murphy was diagnosed with progressive M.S. in 1993. He suffers from various symptoms related to this condition. Murphy has difficulty walking, requiring the use of a cane; suffers numbness and weakness in his limbs; has coordination problems; has memory and cognitive problems, which affect his ability to recall and retain information; and experiences bowel and bladder incontinence.

On June 23, 2003, Murphy applied for a position as a dispatcher at BeavEx. BeavEx is a specialized same-day package delivery brokerage company that coordinates the pick-up and delivery of packages for its customers. It relies on dispatchers to coordinate its delivery operations, reroute drivers and otherwise resolve any logistical issues that arise during the day, and record information as needed by BeavEx's customers. On his application for employment, Murphy indicated that he was able to perform the essential functions of the job. On June 26, 2003, after being interviewed for the job, Murphy was offered

---

1. The complaint also alleged violations of Title VII of the Civil Rights Act of 1991, as amended, 42 U.S.C. §§ 2000e *et seq.,* and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 794 *et seq.* The court previously dismissed those claims. (*See* dkt. # 12.)

the position of dispatcher at BeavEx's North Haven, Connecticut terminal. On June 30, 2003, he accepted the position and began his employment soon thereafter.

Upon the commencement of his employment with BeavEx, Murphy received several documents that detailed the company's policies and procedures. These documents included a copy of BeavEx's "Equal Employment Opportunity Policy" and an employee manual, which detailed the process an employee may initiate in the event of discrimination or harassment, and provided phone numbers and e-mail addresses of persons to be contacted should such issues arise. In September 2003, Murphy completed his application for medical insurance, in which he indicated that he suffered from M.S. The application was presented to Cindy Lim ("Lim"), a secretary at the North Haven terminal, and forwarded to the company's corporate headquarters in Atlanta, Georgia for processing.

Approximately one month into this employment, Murphy had a bowel accident at work, which was related to his M.S. and the medication he was taking. After the incident, Dave Ahern ("Ahern"), the North Haven terminal manager and Murphy's supervisor, informed Murphy that he could go home to change, and that he was to return to work in order to complete his shift. Murphy claims that, at that time, he told Ahern that his bowel accident was a result of his M.S. (Dkt. # 21, Ex. 6 at 69:1–4, hereinafter, "Pl's. Dep.") Ahern, however, stated in his affidavit that neither Murphy nor anyone at BeavEx ever advised him that Murphy suffered from M.S. (Dkt. # 21, Ex. 1 ¶¶ 23–25, hereinafter, "Ahern Aff.") Rather, Ahern stated that Murphy related to him that the bowel problems resulted from the medication Murphy was taking. (Id. ¶ 29.) During the approximate hour and a half during which Murphy

was at home, another dispatcher was required to stay on and cover for him.

Murphy claims that, upon returning to work on the day of the first bowel accident, he was referred to by such nicknames as "Mr. Shitty," "The Shitmeister," and "Poopy." Murphy also claims that such comments were directed at him throughout the course of his employment at BeavEx. Ahern stated that Murphy never complained to him about any name-calling. (Id. ¶ 33.) Sometime after Murphy's bowel accident, a children's book entitled "The Book of Poop" was left in Murphy's work area. Murphy testified that, while he did not think the act of leaving the book at his work station was appropriate, "it was clearly meant as a joke." (Pl's. Dep. at 74:21–75:4.) Ahern stated that Murphy never complained to him about that incident. (Ahern Aff. ¶ 43.)

Approximately seven months into Murphy's employment, he suffered another bowel accident. Murphy stated in his deposition that he thought Ahern had told him he could not go home to clean up. (Pl's. Dep. at 67:7–10.) Ahern maintains, however, that Murphy did not contact him about that bowel accident or any subsequent bowel accident. (Ahern Aff. ¶ 31.) Following the second accident, Murphy was able to clean up in the bathroom and continue working. (Pl's. Dep. at 65:15–21.) Ahern stated that he never disciplined Murphy for having to leave the dispatch area in order to clean himself up. (Ahern Aff. ¶ 30.)

Murphy thereafter suffered a third bowel accident at work. On that occasion, Murphy contacted his wife and she delivered a change of clothes to Murphy at his workplace. After cleaning himself up, Murphy was able to complete his shift.

On two occasions, Murphy was unable to utilize one of the two bathrooms within 100 feet of Murphy's work area. On one of

those occasions, Murphy was unable to enter the bathroom that he usually utilized because a "tow-motor" was parked in front of the door. On the other occasion, Murphy was able to enter the bathroom, but he found the toilet in that bathroom wrapped in tape so as to prevent its use. BeavEx claims that the toilet was taped shut because it had been overflowing and needed repair. (*Id.* ¶ 41.) On both of those occasions, Murphy was able to use the other bathroom located near the dispatch area.

Sometime soon after Murphy began work, his cane was taken from him and placed in the stacks of the warehouse. He was without the cane for around fifteen to twenty minutes before Ahern retrieved the cane and returned it to Murphy. Murphy did not know who took the cane. He testified that he believed he complained to Ahern about that incident. (Pl's. Dep. at 57:5–8.)

In October of 2003, BeavEx's head dispatcher, Robert Rovinelli ("Rovinelli"), criticized Murphy at work for decisions Murphy had made the night before. Murphy testified that Rovinelli shouted at him in front of "everyone in the office," calling him either a "dumb ass" or a "stupid ass," and stating something to the effect that Murphy had "caused a lot of problems for us." (*Id.* at 41:2–22.) Following the incident, Murphy testified that he "just left" without contacting a supervisor. (*Id.* at 46:15–22.) Murphy testified that he did not think he was quitting at that time, despite leaving during his shift. (*Id.* at 47:1–3.)

When contacted by Ahern the following day, Murphy said he had made a mistake in leaving the workplace during his shift and that he wanted to come in and "talk to [Ahern] about [his] job." (*Id.* at 47:15–16.) Murphy told Ahern of his concerns about Rovinelli and asked that Ahern speak with Rovinelli about the latter's treatment of

Murphy. Murphy also promised not to leave work during his shift in the future. Murphy was allowed to return to work, and Ahern met with both Murphy and Rovinelli that day. Rovinelli was given a verbal warning for his conduct. (Ahern Aff. ¶ 36.) Murphy testified that, following this incident, Rovinelli's criticisms of Murphy stopped for a short period of time, and then remained sporadic throughout the rest of Murphy's employment at BeavEx. (Pl's. Dep. at 42:20–25, 43:1–6.) Ahern stated that Murphy never complained to him about Rovinelli during the remainder of Murphy's employment with BeavEx. (Ahern Aff. ¶ 37.)

Sometime during Murphy's employment at BeavEx, two caricatures of Murphy were placed on a wall in the dispatch area alongside caricatures of the other employees who worked in the area. One caricature, which was labeled with Murphy's nickname, "DJ," featured a Special Olympian with a cane in his hand running a race. The other caricature was located on an "award" for "Stupid Employee of the Month" with Murphy listed as the recipient. On the "award" was a picture of a person wearing a t-shirt labeled "duh." Murphy claims that he complained about the caricatures to everyone who worked in the dispatch area, including Ahern. (Pl's. Dep. at 59:22–25, 60:1–2.) He could not recall, however, ever asking to have the caricatures taken down. (*Id.* at 62:14–15.) Ahern stated that he was never told by Murphy that he was offended or hurt by the caricatures, nor did Murphy ever complain to him about them. Rather, it was Ahern's understanding that the caricatures were intended to reflect the employee's personalities. (Ahern Aff. ¶ 38.) The caricatures remained posted in the dispatch area for the duration of Murphy's employment at BeavEx.

In February 2004, Murphy requested a medical leave of absence in order to have a hernia operation. BeavEx's human relations department assisted him in obtaining short-term disability benefits during his time away from work. Murphy was out of work for a total of six weeks in February and March 2004 as a result of his operation and subsequent recovery.

In March 2004, shortly after Murphy returned from surgery, the employees in the dispatch office engaged in a game of dodgeball using a small rubber ball. Murphy was unhappy about the game due to the fact that he had difficulty avoiding the ball and told his coworkers that they should not be throwing the ball at him because of his recent operation. The game lasted approximately ten to fifteen minutes.

On March 17, 2004, Murphy was given a performance review by Ahern. Murphy received an overall evaluation of "needs improvement." At the meeting to discuss the performance review, Murphy did not recall telling Ahern of any problems that were affecting his ability to do his job, nor did he state that he viewed his workplace as hostile. (Pl's. Dep. at 90:9–21.) Murphy testified that he thought he might have mentioned that his job performance problems were related to his M.S., but conceded that he did not have any documentation to support that statement. (*Id.* at 91:19–25, 92:1–2.)

Over a period of a few months, Murphy attempted to contact the president of BeavEx, Mark Tuchmann ("Tuchmann"), via e-mail, on three or four occasions.[2] Murphy testified that he briefly "mentioned a couple of the incidents that were going on" in the e-mails (*id.* at 95:1–16), but he had

no record of what he actually wrote in those messages (*id.* at 92:21–23). Murphy was aware of a problem with his e-mail account, and was therefore unsure whether Tuchmann ever received the e-mails. Murphy never received an e-mail response from Tuchmann, and he never attempted to contact Tuchmann by telephone. On one occasion, Murphy had a short conversation with him while Tuchmann was on a brief visit to the North Haven facility.[3] During this conversation, Murphy mentioned to Tuchmann that he suffered from M.S., but did not discuss any of the alleged incidents at that time.

Murphy claims that on one occasion he "voiced [his] concerns over things that were going on" to a BeavEx employee from the company's Atlanta headquarters who was involved in the installation of new software. Murphy was unsure, however, of the capacity of that employee, and he did not ask the employee to take any action.

In January 2004, BeavEx implemented a new package tracking system. The company held a competition between its various terminals in order to encourage employees to utilize the new system. The competition took place in the first quarter of 2004. The North Haven terminal won the competition, and employees of the terminal were awarded $250 bonuses.

On Saturday, May 22, 2004, Murphy was told that the bonuses had been distributed. Murphy called the secretary, Lim, to inquire as to the status of his bonus. Lim told him that she was not sure whether he would be receiving the bonus. Murphy asked Ruth Nelson ("Nelson"), a BeavEx employee who was filling in for one of the

---

**2.** Murphy could not recall whether he attempted to send the e-mails before or after his return from his hernia operation.

**3.** Murphy could not recall at what point in time during his tenure at BeavEx this conversation took place.

drivers on that day, whether she knew if he was to receive a bonus. She told Murphy that she did not know. Murphy made no attempt to call his supervisor, Ahern, or any other person in management to inquire as to whether he would be receiving a bonus. Later in the day during Murphy's working hours, he placed his key and time sheet under Ahern's door, told Nelson that he was leaving, and left his job with the intention of quitting. Murphy did not attempt to call Ahern or any other of his superiors to inform them that he was leaving.

Ahern claims that the reason Murphy did not receive the bonus was due to the fact that he was out of work for six weeks during the first quarter of 2004. Ahern had contacted BeavEx's human resources department in Atlanta regarding the amount Murphy should have received for his contributions. On May 21, 2004, when the bonus payments were distributed, Ahern apparently had not yet received instructions as to what action to take in regards to Murphy's bonus. (Ahern Aff. ¶ 50.) Sometime after quitting BeavEx, Murphy received a prorated share of the award.

Murphy testified that, at the time he left, he felt that the conditions of his employment at BeavEx created a hostile work environment. He stated that he felt that all of the incidents—including those surrounding his bowel accidents, the caricatures, the book, and the blocked toilets—were of a hostile nature. Thus, he left BeavEx because he felt that "the build up of everything . . . all of the things that had transpired, it just became unbearable." (Pl's. Dep. at 121:6–10.) Because of all of the incidents, Murphy "felt as though [he] was put into a position where [he] really didn't have a choice [but to leave]." (*Id.* at 121:13–16.) Murphy could not recall having contacted anyone in management

about his working conditions following his return from hernia surgery. (*Id.* at 124:16–25, 125:1–5.) Ahern states that he never received a complaint from Murphy after the incident with Rovinelli. (Ahern Aff. ¶ 37.)

On November 15, 2004, Murphy filed a discrimination claim with the Connecticut Commission on Human Rights and Obligations (the "CCHRO"). On April 20, 2006, the CCHRO issued a Release of Jurisdiction letter. On July 19, 2006, Murphy filed his complaint with this court.

## II. DISCUSSION

Murphy alleges that BeavEx's conduct violated the ADA and CFEPA. He also alleges that BeavEx intentionally subjected him to emotional distress in violation of Connecticut common law. BeavEx moves for summary judgment, arguing that Murphy's claims fail as a matter of law. The court shall address the parties' arguments seriatim.

### A. SUMMARY JUDGMENT STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Summary judgment is appropriate if, after discovery, the nonmoving party "failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" *Am. Int'l Group v. London Am. Int'l Corp.,* 664 F.2d

348, 351 (2d Cir.1981) (quoting *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1319–20 (2d Cir.1975)).

A dispute concerning a material fact is genuine " 'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The court must view all inferences and ambiguities in a light most favorable to the nonmoving party. *See Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Id.*

## B. ADA AND CFEPA HOSTILE WORK ENVIRONMENT [4]

■ The ADA provides that no qualifying employer "shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C.A. § 12112(a). CFEPA directs that it "[i]t shall be a discriminatory practice ... [f]or an employer ... to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment because of the individual's ... physical disability...." Conn. Gen.Stat. § 46a–60(a). Murphy alleges that BeavEx discriminated against him by subjecting him to a hostile work environment based upon his disability in violation of the ADA and the CFEPA.[5] Specifically, Murphy claims that he was subjected to continuing and ongoing harassment and discrimination based on his disability. Murphy further claims that BeavEx both contributed to and failed to prevent such discrimination.

As an initial matter, the court points out that "the Second Circuit has not determined whether the ADA gives rise to a cause of action for hostile work environments...." *Balonze v. Town Fair Tire Ctrs.*, No. 3:02CV2247(WWE), 2005 WL 752198, at *8 (D.Conn. Mar. 31, 2005) (citing *Bonura v. Sears Roebuck & Co.*, 62 Fed.Appx. 399, 400 n. 3 (2d Cir.2003)). On the other hand, some other circuits and some district courts within this circuit have recognized such a cause of action. *See, e.g., Fox v. Gen. Motors Corp.*, 247 F.3d 169, 176 (4th Cir.2001); *Flowers v. S. Reg'l Physician Servs., Inc.*, 247 F.3d 229, 232–35 (5th Cir.2001); *De La Cruz v. Guillia-*

---

**4.** "Generally, Connecticut courts use ADA standards to analyze CFEPA disability claims." *Grunberg v. Quest Diagnostics, Inc.*, No. 3:05–cv–1201 (VLB), 2008 WL 323940, at *4 n. 2 (D.Conn. Feb. 5, 2008) (citing *Ann Howard's Apricots Rest. v. Comm'n on Human Rights & Opportunities*, 237 Conn. 209, 224–26, 676 A.2d 844 (1996)). Therefore, the court shall analyze Murphy's ADA and CFEPA hostile work environment claims together.

**5.** BeavEx argues that that Murphy's CFEPA claims are time-barred. Specifically, BeavEx claims that Murphy's CCHRO filing came more than 180 days after the last alleged incident of harassment. *See* Conn. Gen.Stat.

§ 46a–82(f). Nevertheless, where a plaintiff alleges a continuing violation throughout his employment, any alleged incident within the statutory period renders previous incidents timely. *See DeMoss v. City of Norwalk Bd. of Educ.*, No. 3:05cv736 (WWE), 2007 WL 3432986, at *4 (D.Conn. Nov. 14, 2007). Given that Murphy claims that the name-calling persisted throughout the course of his employment, and that he claims that the caricatures remained posted in the dispatch area at the time he left the company, the court concludes that Murphy's CFEPA claims are not time-barred.

*ni,* No. 00Civ.7102(LAK)(JCF), 2002 WL 32830453, at *9 (S.D.N.Y. Aug. 26, 2002); *Disanto v. McGraw–Hill/Platt's Div.,* No 97Civ.1090 JGK, 1998 WL 474136, at *5 (S.D.N.Y. Aug. 10, 1998); *Hendler v. Intelecom USA, Inc.,* 963 F.Supp. 200, 208 (E.D.N.Y.1997); *Hudson v. Loretex Corp.,* No. 95–CV–844(RSP/RWS), 1997 WL 159282, at *3 (N.D.N.Y. Apr. 2, 1997). This court need not reach the issue of whether the ADA supports such a cause of action because, even if such a cause of action existed, Murphy cannot establish the elements of a hostile work environment claim.

◼ Courts which recognize hostile work environment claims under the ADA apply the same standard utilized in Title VII cases. *Hendler,* 963 F.Supp. at 208. In order to prevail under that standard, a plaintiff must establish two elements. First, a plaintiff must show that his workplace was " 'permeated with discriminatory intimidation, ridicule and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment.' " *Torres v. Pisano,* 116 F.3d 625, 630–31 (2d Cir.1997) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)); *see Murray v. N.Y. Univ. Coll. of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995). In evaluating a hostile work environment claim, a court should consider the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *See Harris,* 510 U.S. at 23, 114 S.Ct. 367; *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767–68 (2d Cir.1998). "Generally, isolated incidents of harassment do not give rise to a hostile work environment claim; instead, the incidents must be 'sufficiently continuous and concerted in order to be deemed perva-

sive.' " *Balonze,* 2005 WL 752198, at *8 (quoting *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir.1997)). " 'Simple teasing, offhand comments, and isolated incidents ... will not amount to discriminatory changes in the terms and conditions of employment sufficient to meet the threshold of severity or pervasiveness.' " *Crawford v. N.Y. Life Ins. Co.,* No. 04–CV–1853, 2006 WL 2792779, at *8 n. 4 (E.D.N.Y. Sept. 27, 2006) (quoting *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)).

◼ Second, a plaintiff must show that "a specific basis exists for imputing the conduct that created the hostile environment to the employer...." *Murray,* 57 F.3d at 249 (citing *Karibian v. Columbia Univ.,* 14 F.3d 773, 779 (2d Cir.1994)). "[E]mployer liability for a hostile environment created by coworkers, or by a low-level supervisor who does not rely on his supervisory authority in carrying out the harassment, attaches only when the employer has 'either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.' " *Id.* (quoting *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 63 (2d Cir.1992)); *see Karibian,* 14 F.3d at 780.

◼ In this case, Murphy has not proffered sufficient evidence to establish the first element of his hostile work environment claim. As an initial matter, the court points out that several of the alleged incidents cited by Murphy were not even specifically targeted at him. On the occasions in which access to the bathroom normally utilized by Murphy was restricted, such access was denied to all employees of the dispatch area. Likewise, the dodgeball game involved various employees from the dispatch area, and there is no evidence to suggest that the game was carried out for the purpose of harassing Murphy. Thus, such incidents are not relevant to a hostile

work environment analysis because they neither evince the requisite discriminatory intent, nor appear to have been at all directed specifically toward Murphy.

■ In considering the remaining alleged incidents in a light most favorable to Murphy, the court concludes that a reasonable jury could not find such conduct so severe and pervasive as to have altered his working conditions. While it was insensitive for Murphy's coworkers to call him names and leave a scatological children's book near his workspace, such teasing does not rise to the level of severity and pervasiveness required to defeat a motion for summary judgment. *See Crawford*, 2006 WL 2792779, at *8 (comments and gestures directed at the plaintiff because of her irritable bowel syndrome were insufficient to establish a hostile work environment claim); *Balonze*, 2005 WL 752198, at *9 (daily, offensive name-calling did not establish the basis for a hostile work environment claim).

■ The alleged harsh criticism of Murphy by Rovinelli is also insufficient to establish a hostile work environment claim. *See LaBella v. New York City Admin. for Children's Servs.*, No. 02–CV–2355(NGG)(KAM), 2005 WL 2077192, at *20 (E.D.N.Y. Mar. 28, 2005) ("[A]n employer's conduct is not hostile merely because it is unpleasant, harsh, combative or difficult.") (internal quotation marks omitted); *Benette v. Cinemark U.S.A., Inc.*, 295 F.Supp.2d 243, 250 (W.D.N.Y.2003) ("The nation's workplace is most likely populated with abusive, banal, profane and vulgar supervisors .... [who] use insensitive, profane and vulgar language toward employees. Such evidence, though, is insufficient to make out a claim for discrimination."). This is especially so where, as here, the comments are directed at Murphy's job performance and do not display a "discriminatory animus." *See LaBella*,

2005 WL 2077192, at *20. Indeed, there is no evidence that Rovinelli's comments were in any way connected to Murphy's M.S.

■ In addition, the cartoon and the picture depicting Murphy that were posted in the dispatch area are insufficient to establish a hostile working environment. *See Henry v. Guest Servs., Inc.*, 902 F.Supp. 245, 251–52 (D.D.C.1995) (finding a cartoon placed in the plaintiff's mailbox that made light of the plaintiff's disability was insufficient to support a hostile work environment claim). In the present case, while Murphy complained about the caricatures, he specifically testified that neither of the caricatures adversely impacted his ability to do his job. (Pl's. Dep. at 61:13–15, 62:5–7.) Thus, the posting of those caricatures cannot be used as a basis for Murphy's claim where he makes no allegation that they served to alter the terms of his employment.

■ Aside from the foregoing allegations, the only other incident on which Murphy can reasonably rely for a claim of a hostile work environment were the occasions on which his cane was taken and hidden in the warehouse. As Murphy testified, however, this conduct occurred on only two occasions. Thus, this court cannot conclude that those episodes constituted anything more than the type of isolated, sporadic incidents that are insufficient to establish a hostile work environment claim. *See Faragher*, 524 U.S. at 788, 118 S.Ct. 2275.

Even taking all of the alleged incidents in the aggregate, they fail to establish a *prima facie* case for a hostile work environment. Indeed, the facts in the present case are analogous to those in *Rios v. Buffalo & Fort Erie Pub. Bridge Auth.*, No. 04–CV–375A, 2008 WL 657121 (W.D.N.Y. Mar. 7, 2008), where the court

held that offensive comments, jokes, and cartoons directed at the plaintiff were too infrequent to establish a hostile work environment. *Id.* at *5. In *Rios*, the court noted that in *Petrosino v. Bell Atl.*, 385 F.3d 210 (2d Cir.2004), the Second Circuit had held that offensive comments, jokes, and drawings could establish a *prima facie* case when "*demeaning* conversations ... were ... an accepted part of the *daily* work environment" and the plaintiff was "*constantly* confronted" with offensive drawings. *Id.* at *3 (quoting *Petrosino*, 385 F.3d at 214) (emphasis in original). In *Rios*, however, the plaintiff could not establish a hostile work environment claim in a situation where she "ha[d] identified only a handful of offensive cartoons, drawings, jokes and comments that occurred over a lengthy period of time." *Id.* at *4.

▬ Here, Murphy was subjected to two caricatures, name-calling, and had his cane taken away on two occasions. Murphy could not, though, recall ever asking to have the caricatures removed (Pl's. Dep. at 62:15–16), nor did he claim that he ever complained about the name-calling to Ahern or any of his other superiors. Even if Murphy was offended by the comments and caricatures, a hostile work environment claim will not stand where "there is no evidence that they interfered with [his] ability to perform [his] job." *Id.* at *4; *see Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80–81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (noting the Court's desire to set the standards for a viable hostile work environment claim sufficiently high to prevent converting Title VII into a "general civility code" for the workplace). Thus, even viewing the facts in a favorable light to Murphy, a reasonable jury could not

conclude that the alleged incidents of discriminatory harassment were so severe and pervasive so as to alter the terms of Murphy's employment. Accordingly, with regard to Murphy's hostile work environment claims, BeavEx's motion for summary judgment (**dkt. # 17**) is **GRANTED.**

## C. ADA AND CFEPA DISCRIMINATION

Murphy also alleges that he suffered employment discrimination based on his disability under both the ADA and CFEPA.[6] Specifically, Murphy claims that he was forced to quit as a result of continuing and ongoing harassment, ridicule, and abuse based on his disability, which BeavEx refused to prevent. In short, Murphy alleges that he was constructively discharged as a result of being subjected to a hostile work environment.

▬ The all-familiar burden-shifting analysis for Title VII cases, as first articulated in *McDonnell Douglas v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), also applies to employment discrimination claims under the ADA. *See Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir.1999) ("In analyzing a discriminatory discharge claim under the ADA, we apply the burden-shifting analysis established by the Supreme Court in *McDonnell Douglas*....") The plaintiff must first demonstrate "by the preponderance of the evidence a prima facie case of discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the *prima facie* case is met, the burden shifts to the defendant to rebut the presumption of discrimi-

---

**6.** The court again notes that "[t]he Connecticut Supreme Court looks to federal precedent when interpreting and enforcing the CFEPA." *Farrar v. Town Of Stratford*, 537 F.Supp.2d 332, 348 (D.Conn.2008). Thus, the court shall analyze the ADA and CFEPA discrimination claims together.

nation by articulating a legitimate, non-discriminatory reason for its employment decision. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The defendant's burden is "one of production, not persuasion; it can involve no credibility assessment." *Id.* (internal quotation marks omitted). If the defendant meets this burden, "the *McDonnell Douglas* framework-with its presumptions and burdens"-disappear[s], ... and the sole remaining issue [is] discrimination *vel non....*" *Id.* at 142–43, 120 S.Ct. 2097 (internal citations and quotation marks omitted).

 In order to establish a *prima facie* case of employment discrimination under the ADA, a plaintiff must show that: (1) his employer is subject to the ADA; (2) he is disabled pursuant to the ADA; (3) he is qualified to perform the essential functions of his job; and (4) he suffered an adverse employment action because of the disability. *Curcio v. Bridgeport Bd. of Educ.*, 477 F.Supp.2d 515, 519 (D.Conn.2007) (citing *Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir.2001)). It is undisputed that the first three elements of the *prima facie* case are satisfied here. Thus, the only question is whether Murphy suffered an adverse employment action based upon his disability. Murphy claims that the adverse employment action he suffered was a constructive discharge. BeavEx argues that Murphy's constructive discharge argument fails as a matter of law.

 A plaintiff may satisfy the adverse employment action requirement by a showing of a constructive discharge. *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 87 (2d Cir.1996). The Supreme Court of Connecticut utilizes the same definition of constructive discharge as the Second Circuit Court of Appeals. *See Brittell v. Dep't of Corr.*, 247 Conn. 148,

178, 717 A.2d 1254 (1998). Constructive discharge occurs "when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." *Chertkova*, 92 F.3d at 89. A plaintiff must satisfy two prongs of this standard by showing: (1) the employer's conduct was intentional, and (2) working conditions had reached an intolerable level. *Petrosino*, 385 F.3d at 229. For working conditions to be judged intolerable, they must be "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Chertkova*, 92 F.3d at 89 (internal quotation marks omitted).

 "Intolerability of working conditions is based on an objective standard of whether a reasonable person in the employee's position would have felt compelled to resign. An employee's subjective opinion that his or her working conditions are intolerable is not sufficient to establish constructive discharge." *Goldfarb v. Town of West Hartford*, 474 F.Supp.2d 356, 374 (D.Conn.2007) (internal quotation marks omitted). In addition, "a reasonable employee will usually explore ... alternative avenues thoroughly before coming to the conclusion that resignation is the only option.... Alternatives include filing a grievance or threatening to quit if changes are not made.... If a plaintiff does not pursue alternatives short of resignation, it may "indicate[ ] that retirement was not [his] only option." *Id.* (internal citations and quotation marks omitted).

 In the present case, Murphy bases his constructive discharge claim on his allegation of a hostile work environment. As seen above, Murphy has not brought forth sufficient evidence to support a hostile work environment claim. Therefore, any allegation of a constructive discharge

must also fail. *See Sinopoli v. Regula,* 125 F.3d 844, 1997 WL 624987, at *2 (2d Cir. 1997) (unpublished table decision) (rejecting a claim of constructive discharge based on a hostile work environment where there was insufficient evidence of "severe and pervasive" conduct); *Colter v. Yale Univ.,* No. 3:97CV2024 RNC, 2000 WL 559023, at *4 (D.Conn. Mar. 24, 2000) (finding conduct that is not "severe and pervasive" enough to establish a hostile work environment could not serve as the basis for a constructive discharge claim).

■■■ Additionally, the event that Murphy claims precipitated his decision to quit was completely unrelated to his disability. Murphy brought forth no evidence to suggest that the reason he did not receive his bonus had anything to do with his disability. Instead of checking with any of his superiors regarding his non-receipt of the bonus, Murphy simply left BeavEx. Even if Murphy assumed that his failure to receive a bonus was related to what he perceived as an ongoing pattern of harassment based on his disability, his decision to leave BeavEx was not in keeping with his obligation to be reasonable. *See Garner v. Wal–Mart Stores, Inc.,* 807 F.2d 1536, 1539 (11th Cir.1987) ("Part of an employee's obligation to be *reasonable* is an obligation not to assume the worst, and not to jump to conclusions too fast.") (emphasis in original); *see also West v. Marion Merrell Dow, Inc.,* 54 F.3d 493, 498 (8th Cir. 1995); *Wilson v. Firestone Tire & Rubber Co.,* 932 F.2d 510, 515 (6th Cir.1991); *Dornhecker v. Malibu Grand Prix Corp.,* 828 F.2d 307, 310 (5th Cir.1987). As a result, Murphy's decision to leave BeavEx did not constitute a constructive discharge. Therefore, Murphy has not demonstrated that he suffered an adverse employment action, and he cannot meet his *prima facie* case of discrimination under either the ADA or CFEPA. Consequently, with regard to Murphy's ADA and CFEPA discrimination claims, BeavEx's motion for summary judgment (**dkt. # 17**) is **GRANTED.**[7]

## D. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Although Murphy's compliant is not separated into distinct parts, it appears that he is attempting to allege an intentional infliction of emotional distress claim. Specifically, Murphy claims that the actions of BeavEx were "extreme and outrageous." (Dkt. # 1 ¶ 42.) Because those words could be read to state the elements of an emotional distress claim, the court shall assume that Murphy was attempting to assert such a claim.

■■■ In order to state a successful claim for the intentional infliction of emotional distress under Connecticut law, a plaintiff must show:

(1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress and (4) that the emotional distress sustained by the plaintiff was severe.

*Petyan v. Ellis,* 200 Conn. 243, 253, 510 A.2d 1337 (1986), *superseded by statute on other grounds as recognized in Chadha v. Charlotte Hungerford Hosp.,* 272 Conn. 776, 865 A.2d 1163 (2005). "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and

---

**7.** Murphy's complaint was unclear as to whether he was alleging a constructive discharge claim separate from the ADA/CFEPA discrimination claim. Obviously, the court's decision here also grants summary judgment for any such claim.

outrageous is initially a question for the court to determine." *Appleton v. Bd. of Educ. of Stonington*, 254 Conn. 205, 210, 757 A.2d 1059 (2000). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 210–11, 757 A.2d 1059 (citing 1 Restatement (Second) of Torts § 46, comment (d) (1965)).

■ BeavEx's conduct does not meet this standard. Thus, Murphy's allegations could not, as a matter of law, give rise to a claim for intentional infliction of emotional distress. The evidence in the record, which has been discussed in Murphy's foregoing claims, does not lend itself to the conclusion that BeavEx acted in a manner that is so outrageous in character or extreme in degree that it went beyond all possible bounds of decency, or that BeavEx took any actions that could be regarded as atrocious and utterly intolerable in a civilized community. Although Murphy was subjected to some conduct which could be viewed as unpleasant and insensitive, this falls far short of the stringent standard required to establish a claim for intentional infliction of emotional distress. Accordingly, with regard to Murphy's intentional infliction of emotional distress claim, BeavEx's motion for summary judgment (**dkt. # 17**) is **GRANTED**.

### III. CONCLUSION

For the foregoing reasons, BeavEx's motion for summary judgment (**dkt. # 17**) is **GRANTED**. **Judgment in favor of the defendant, BeavEx, Inc., shall enter on all counts of the complaint. The clerk shall close this file.**